Wachtler, J.
The defendant has been convicted of attempted murder and felonious possession of a weapon in connection with the shooting of two New York City police officers. The Appellate Division has affirmed the convictions. The primary issues on this appeal are whether the defendant was deprived of a fair trial (1) by media coverage of similar crimes, committed and reported during the selection of the jury and (2) by evidence introduced at trial showing that the apartment, used by the defendant and others at the time of the shooting, contained militant antipolice documents and a *425 "field hospital.” The order of the Appellate Division should be affirmed.
The shooting occurred May 19, 1971 on Riverside Drive in Manhattan. That evening a marked police car with two uniformed police officers, Thomas Curry and Nicholas Binetti, was stationed outside the home of Frank Hogan who was then District Attorney of New York County. At approximately 9 o’clock the officers noticed a car going the wrong way on a one-way street. They pursued the vehicle and, after stopping it, were met with a hail of machine gun bullets.
Both of the officers were seriously injured but survived the assault. Neither however was able to identify the persons who attacked them. Bystanders supplied some information—a description of the car as a blue or green late model Maverick or Mustang, several variations of the license plate number[1] and a general description of the occupants as being Black. In addition police ballistics experts were able to determine that the two officers had been shot by a .45 caliber automatic or semiautomatic weapon.
Two days after the shooting (May 21) a young Black woman left a package at WLIB, a Harlem radio station. Approximately a half an hour later a Black man left a similar package, folded inside a newspaper, at the security desk of The New York Times. Each of the packages contained a New York license plate No. 8373YR, a .45 caliber cartridge, an áirmail envelope and a typewritten letter. The envelope indicated that it contained a letter explaining "[t]he shooting of two N.Y.P.D. Pigs on Malcolm’s Birthday”, apparently referring to May 19, the birthday of Malcolm X. The letters stated: "Here are the license plates sort [sic] after by the Fascist state pig police. We send them in order to exhibit the potential power of oppressed peoples to acquire Revolutionary Justice. The armed goons of this racist government will again meet the guns of oppressed third world peoples as long as they occupy our community and murder our brothers and sisters in the name of law and order * * * The domestic armed forces of racism and oppression will be confronted with the guns of the Black Liberation Army, who will meet [sic] out in the tradition of Malcolm and all true revoluntionaries real justice. We are Revolutionary Justice” (the underscored portions were typed in red).
*426 Analysis by police experts revealed that each letter had been written on the same typewriter and halves of the same piece of paper. The police also discovered four readable fingerprints on the newspaper which had been folded around the package delivered to The New York Times. The license plates, it turned out, had been stolen prior to the shooting.
In the early morning hours of June 5, 1971 the defendant and three others were arrested in an unrelated incident at a Bronx "after hours” bar. Several weapons, were found in the bar including a loaded .45 caliber submachine gun. One of the patrons said the defendant had entered the bar armed with the submachine gun. Police ballistics experts immediately checked the weapon and found that it was the one which had been used in the Riverside shooting. The police also learned that the defendant’s fingerprints matched two of the four prints found on the newspaper which had been left with the package at the office of The New York Times.
A week later (June 12, 1971) the police received an anonymous call from a woman who stated that the defendant had spent the evening of May 19 at a Bronx apartment belonging to the common-law wife of one Eddie Joseph. That lead them to Pauline Joseph who became the chief witness for the prosecution.[2]
Pauline Joseph stated that in January, 1971 a girl friend of hers moved into her apartment with a man named Andrew Jackson, who was active in the Black Panther Party. After that a number of Jackson’s friends, including the defendant and Eddie Joseph, visited the apartment and, one by one, set up residence there. On May 15 the defendant moved in with a black vinyl bag containing a machine gun. Later that day she saw a diagram of a building and was informed that the defendant and Michael Hill were then planning to blow up a police station. They apparently abandoned this plan when she protested that "innocent people”, meaning prisoners, might get hurt. The following day she again asked the defendant and Hill what they planned to do. The defendant replied "we’re going to deal with some pigs.” This time however he had decided to "hit them from the outside.” When she pressed for *427 further details the defendant simply said "I’m going to kill them.”
On May 19 Pauline Joseph saw the defendant load the machine gun and place it in a duffel bag. At approximately 6 p.m. he picked up the duffel bag and left the apartment. Within 10 or 15 minutes, Irving Mason and Eddie Joseph, who was armed with a hand gun, also left the apartment. The three men returned approximately four and one-half hours later. Pauline Joseph noticed that one of the machine gun magazines was empty. The defendant would not tell her what had happened to the bullets. At 11 o’clock they all watched the news reports of the Riverside shooting on television. After it was over Pauline Joseph told the defendant "I think you did it” and he replied "so what, you better learn to keep your mouth shut.”
That evening Pauline Joseph and Irving Mason’s wife found an expended shell casing on the floor of a blue Maverick parked two blocks from the building. They turned it over to Irving Mason. The following day she saw two license plates in the apartment and she heard the defendant and several others discussing the possibility of getting into the hospital "to finish off the cops.”
The next day (May 21) defendant’s girl friend, Patricia Greene, came to the apartment with a portable typewriter. Later Pauline Joseph saw the defendant writing something on a pad with the girl beside him making corrections. In the late afternoon she saw a sheet of paper in the typewriter with the words "Revolutionary Justice” written in red. In one of the bedrooms she saw two license plates, envelopes, wrapping paper and other items including about four or five cartridges. That evening when Mrs. Mason and Andrew Jackson left the apartment at about 6 o’clock, Pauline Joseph noticed that Mrs. Mason was carrying a package addressed to "WLIB News”. When Mason and Jackson returned approximately two hours later, the defendant, his girl friend and several others were listening to music on radio station WLIB. Shortly thereafter the announcer mentioned a package which had just been received and read the "Revolutionary Justice” letter. The defendant and Eddie Joseph then looked at each other, smiled and slapped each other’s hand in a congratulatory manner.
With Pauline Joseph’s consent the police searched her apartment. They found fingerprints from a number of individuals she had mentioned, including the defendant. In one room, *428 which they characterized as a "field hospital”, they found a large store of medical supplies. They also discovered a number of letters and other documents including: (1) a leaflet listing medical supplies and equipment and describing how to treat an arm wound; (2) a single paragraph "History of the Black Panther Party”, concededly written by the defendant, in which he states that this is the "first National Organization to utilize Armed Propaganda”; (3) a crude map or diagram of what appears to be a prison; (4) two letters from one Landon Robert to his wife discussing Black militant activities; (5) a "press release” stating that the people should be informed of the "N.Y.P.D’s plan for premeditated murder” and "how the pigs occupy our communities like a foreign army”; (6) a letter addressed to the police commissioner referring to the Riverside shooting and stating that "what we have in mind is to let you know that EVERYTIME you use your guns against our people we’ll use our guns against your repressive forces” (emphasis in original). The last two documents had been written on the same typewriter which had been used for the letters sent to WLIB and The New York Times.
At the trial the defendant objected to the introduction of these documents and the description of the room containing the medical supplies. The court overruled the objections noting at one point that this evidence showed "the character of the premises and the persons that occupied it.” The defendant claims that this was improper because he had chosen not to place his character in issue (see, e.g., People v Fiore, 34 NY2d 81). He also claims that this evidence bore no connection to him or the Riverside shooting and could only have served to prejudice the jury against him.
Of course none of the evidence at trial directly established the defendant’s guilt. The People’s case was largely circumstantial. In such a case "motive often becomes not only material but controlling” (People v Fitzgerald, 156 NY 253, 258). According to Pauline Joseph, the defendant and his associates planned and carried out the Riverside shooting because they had a vicious ideological hatred for the police. Her testimony on this point was properly admitted to show the motive for the shooting even though it reflected on the defendant’s character (People v Fitzgerald, supra, p 259) and the character of his associates (People v Hagan, 24 NY2d 395, 400), which was not otherwise in issue. The other evidence which the defendant claims was improperly admitted, tended *429 to corroborate her testimony and thus was also properly admitted at the trial. It was for the jury to determine whether it was entitled to any weight.
The defendant also claims that he was deprived of a fair trial because of adverse publicity in the various news media and the court’s failure to employ certain measures to check its impact. The argument it should be noted is not addressed to the publicity which preceded this trial—the reports of the shooting, the "Revolutionary Justice” letters, the recovery of the shotgun or the defendant’s arrest for robbery and indictment for attempted murder of the two police officers. Nor is he concerned about the fact that he had previously been tried for the Riverside shooting, which resulted in a hung jury and additional publicity just a few weeks before this trial. He never moved for a change of venue, a continuance, sequestration or any other relief based on the reports of these events and does not claim that any of this publicity affected his right to a fair trial.[3] He argues instead that certain items reported during the selection of the jury at this, his second trial, enveloped the trial in "adverse and prejudicial publicity.”
Jury selection at this trial began on January 15, 1973 and ended on February 8, 1973. The indictment was read to the prospective jurors and throughout the voir dire they were questioned by both sides, as to whether they had read or heard anything about the case. A number of them said that they had heard of the incident or the defendant. A few said that because of this they did not feel that they could decide the case impartially and they were excused on consent. Most however had only vague recollections of the incident and stated that this would not affect their judgment. From the outset, and throughout the voir dire, defense counsel impressed upon the prospective jurors that the defendant was, or had been, a member of militant Black groups which were said to advocate violence, and he obtained their assurance that this would not affect their ability to decide the case impartially. And, of course, the court repeatedly admonished them not to read or listen to any accounts of the shooting or the trial.
The proceedings were adjourned from January 18 to January 29 because of the illness of defense counsel. During this period two attacks were made on police officers by Blacks *430 armed with automatic weapons. The first incident occurred on January 25 in the Brownsville section of Brooklyn and the second took place on January 28 in Queens County. In each case two officers had been wounded.
These incidents were reported by New York City’s three major daily newspapers. The accounts generally noted that the police suspected the attacks had been made by certain members of the so-called "Black Liberation Army”. Several suspects were named including Andrew Jackson, Eddie Joseph and Joanne Chesimard who, according to some accounts, was also being sought in connection with the Riverside shooting. Only one of the articles mentioned the defendant and then only incidentally. That article suggested that the Brownsville attack "was similar to” the Riverside shooting for which "Richard Moore, a member of the Black Panther Party” had been indicted. The article then noted that his first trial on this charge had ended in a hung jury last month and that he was presently being retried.
When the trial resumed on January 29 defense counsel argued that the defendant could not obtain a fair trial while the media were reporting the fact that Black militants, some of whom were associated with the defendant, were making attacks on police officers. He asked that the entire jury panel be discharged, that a mistrial be declared and that the case be postponed, for several weeks, until the publicity surrounding these incidents had abated. The court denied the motion after noting at various points during the argument that the articles dealt essentially with other crimes by other individuals, that attacks on police officers were not uncommon in the City of New York, and that the defendant could question "potential jurors as to what they read and if it will have any bearing on their verdict in this case.”
On January 30, January 31 and February 5, defendant renewed the motion, on one occasion requesting a six-month continuance, because follow-up articles had appeared reporting the efforts of police and other officials, to apprehend the suspects in the Brownsville and Queens shootings and to guard against further attacks on police officers. These motions were also denied.
On February 6, when 11 jurors had been chosen and sworn, the defendant produced a recently published magazine article entitled "Target Blue”, which had been written by a former Deputy Police Commissioner of the City of New York. The *431 article, which appeared as the cover story in the current issue of New York Magazine, discussed attacks by Black militants, particularly the Black Liberation Army, on police officers during the past two years. A portion of the article described the Riverside shooting and the events leading to the defendant’s arrest and indictment much as they were described at trial. In some respects it went beyond the proof admitted at trial by, for instance, noting that the defendant had been charged with committing other crimes on other occasions.[4]
Referring to this article, the defendant again moved for a mistrial and a continuance and again the motion was denied. Two days later the defendant asked the court to sequester the jury, which was also denied.[5] Later in the day defense counsel remarked "I think it would be appropriate for his Honor to ask those eleven jurors [who had been sworn prior to the appearance of 'Target Blue’] if they had occasion to see the article and/or read it.” The court denied the motion stating "I’ve already admonished them not to read anything in connection with this case, and I must resolve that they are keeping their word in that respect.” That day the jury selection process was completed. There were 12 regular jurors and 4 alternates.
The defendant argues that the court should have granted the motions for a continuance. In addition he claims that after the appearance of "Target Blue” the court should have sequestered the jury and questioned the 11 jurors who had already been sworn to see whether they had read the article and been affected by it.
The accused, of course, is entitled to a "fair trial in a fair tribunal” (Matter of Murchison, 349 US 133, 136; People v McLaughlin, 150 NY 365, 375). The question, stated in its broadest terms, is whether in view of the publicity which occurred during the selection of the jury, the relief requested was necessary to insure the defendant’s right to a fair trial *432 (Sheppard v Maxwell, 384 US 333; cf. Nebraska Press Assn. v Stuart, 427 US 539).
The publicity itself falls into three general categories: (1) reports of the defendant’s involvement in the crime charged; (2) reports of other crimes committed by the defendant, and (3) reports of similar crimes committed by individuals or groups associated with the defendant.
Obviously the most damaging type of publicity is that which shows or states that the defendant has committed the crime charged (Sheppard v Maxwell, supra; Irvin v Dowd, 366 US 717; Rideau v Louisiana, 373 US 723). Collateral references to the fact that the defendant has committed other crimes, generally have a lesser impact (see, e.g., Murphy v Florida, 421 US 794, 797, 798; compare Marshall v United States, 360 US 310) but may nevertheless prejudice his case, especially when the other crimes are similar, or otherwise related, to the crime charged (see, e.g., Irvin v Dowd, supra). But the Constitution does not impose an "impossible standard” (Irvin v Dowd, supra, p 723). There is no requirement "that the jurors be totally ignorant of the facts and issues involved” (Irvin v Dowd, supra, p 722) or the defendant’s other involvements with the law (Murphy v Florida, supra, p 799). What is generally condemned is the "trial by newspaper” or other media in which a substantial portion of the community has been exposed to inflammatory reports purportedly establishing defendant’s guilt (Sheppard v Maxwell, supra; Irvin v Dowd, supra; Rideau v Louisiana, supra; Murphy v Florida, supra).
Here, as noted, only two articles mentioned the defendant in connection with the Riverside shooting. One simply recalled the fact that the shooting had taken place and that the defendant was standing trial for attempted murder. The other article, "Target Blue”, described the crime and how the police had "solved” it. That was also the only article which referred to the defendant’s other criminal activities. The prejudicial impact of this article was no doubt diminished by the fact that the substance of the police investigation, "one of the most prominent features” of the article, was later introduced in evidence at the trial (Stroble v California, 343 US 181, 195). But what is most significant is that the defendant, who was tried in one of the largest cities in the Nation, can only point to one article, in a magazine of unknown circulation,[6] in *433 which his involvement in the crime and other criminal activities were discussed in any detail (compare Sheppard v Maxwell, supra; Irvin v Dowd, supra; Rideau v Louisiana, supra; see, also, Beck v Washington, 369 US 541).
Most of the publicity the defendant complains of involves reports of similar crimes committed by other persons during the jury selection process. The major question on this appeal is whether publicity of this nature could affect the defendant’s right to a fair trial. Taken as a general proposition, and carried to its logical extreme, it would mean, for instance, that no one accused of robbery could receive a fair trial as long as the media continued to report the numerous robberies committed daily—unless the courts, as a matter of course, employed extraordinary measures to shield the jury from the unending publicity. Of course attacks on police officers are less common than robberies and "assassinations” by militants are rarer still. But, if there is a right to be shielded from publicity of similar crimes, it cannot depend on the novelty of the offense. The right to a fair trial applies to all and not just those accused of unusual crimes.
Here however the defendant notes that the crimes were not only similar but have also been attributed to persons and groups associated with the defendant, which in a few instances was specifically noted by the media. This he argues is akin to saying that the defendant is a member of "organized crime”, a kind of guilt by association (see, e.g., People v Genovese, 10 NY2d 478). But the analogy is not complete because this is not a case where the jury had no right to know of the defendant’s association with the Black Liberation Army or any of its members. As noted, evidence of the defendant’s relationship with the group and their stated hostility to the police was properly admitted at trial to show the motive for the crime. Thus although the details of the group’s most recent exploits were not, of course, introduced in evidence, media references to the defendant’s association with the Black Liberation Army and its creed, could not be said to be prejudicial in the sense that it "was never heard from the witness stand” (Sheppard v Maxwell, 384 US 333, 356 supra).
In sum, the potential for prejudice from media publicity is most tenuous when it involves reports of similar crimes committed by other individuals, even when, as here, it involves groups associated with the defendant. Consequently it is an area in which the trial court must be allowed the greatest *434 latitude in determining whether special measures should be employed to insure the defendant’s right to a fair trial. We could not say, for instance, that the court abused its discretion in refusing to order the "extreme” remedy of sequestration in this case considering the lengthy trial, the nature of the proof at trial and the inconsequential content of the four articles which appeared after the defendant made the motion in connection with "Target Blue” (see Matter of Oliver v Postel, 30 NY2d 171, 182-183; Stephens v People, 19 NY 549, 554).
The court could have questioned the 11 sworn jurors after "Target Blue” appeared to see whether any of them had read it and been influenced by it, as indeed he might have done when each of the articles appeared. But he had repeatedly ordered all the jurors not to read or listen to anything about the case. In fact after the first article appeared he ordered them not to read anything regarding assaults on police officers generally. And, as noted, throughout the proceedings the prospective jurors had been constantly questioned about their exposure to publicity concerning the case, the defendant and Black militant groups. Significantly not one of the 11 jurors who had been sworn had heard anything about the defendant’s involvement in the shooting. Even more significant is the fact that of the 18 prospective jurors called after "Target Blue” appeared only one of them had seen the article and he had not read it, in obedience to the court’s order.
In a case like this the court could also find that a continuance is an inappropriate remedy. In every case the court must consider the risk that the media will pick up the defendant’s trial when it resumes. Here the risks are multiplied. As long as the other members of the group remain at large, it is most likely that at some point there will be a resumption of the type of publicity he seeks to avoid, either because of the others’ individual or collective future activities or police efforts to apprehend them. And of course publicity does not necessarily or even generally cease upon arrest. The possibilities are endless, but the point is that a continuance may easily become an indefinite postponement when the defendant seeks to avoid the publicity generated by a group with which he has become associated.
The obvious remedy under these circumstances is not to change the time of trial but to change the place of trial. It is notable that the defendant in this case never applied for a *435 change of venue, even when the prosecutor suggested this and offered to consent. This may not be dispositive, but it cannot be ignored. The Supreme Court has noted that "in an effort to determine whether there was public hysteria or widespread community prejudice against petitioner at the time of his trial, we think it significant that two deputy public defenders who were vigorous in petitioner’s defense throughout the trial, saw no occasion to seek a transfer of the action to another county on the ground that prejudicial newspaper accounts had made it imposssible for petitioner to obtain a fair trial” in the county where the trial was held (Stroble v California, 343 US 181, 194, supra).
The Supreme Court has also noted that the "length to which the trial court must go in order to select jurors who appear to be impartial is another factor relevant in evaluating those jurors’ assurances of impartiality” (Murphy v Florida, 421 US 794, 802-803, supra). In the Murphy case it was held that although 20 of the 78 persons questioned were excused because they had formed an opinion of the defendant’s guilt that by "no means suggests a community with sentiment so poisoned against petitioner as to impeach the indifference of jurors who displayed no animus of their own” (Murphy v Florida, supra, p 803). In this case only 8 of the 85 prospective jurors questioned on the voir dire were excused because they doubted their ability to be impartial or had formed an opinion of the defendant’s guilt based on adverse publicity—and that for the most part was pretrial publicity, not the subsequent publicity of which the defendant complains on this appeal. In short, we find no basis for concluding that the defendant was denied his right to a fair trial because of the media reports which occurred during the jury selection process.
We have considered the other issues raised by the defendant but have found them to be without merit. With respect to the prosecutor’s alleged improper use of the notice of alibi, we would note that at the trial defense counsel objected on the ground that the prosecutor was falsely stating the contents of the notice, and not on the ground now urged, that the notice could not be used for impeachment purposes. Since the issue was not raised at trial, it is beyond the scope of our review (CPL 470.05, subd 2; People v Tutt, 38 NY2d 1011).
Accordingly, the order of the Appellate Division should be affirmed.
*436 Chief Judge Breitel and Judges Jasen, Gabrielli, Jones, Fuchsberg and Cooke concur.
Order affirmed.

. There were three possible license plate numbers: 8373YR; 8373YD, and 8733YA.

. At the trial it was stipulated that Pauline Joseph made the anonymous call herself in which she originally stated that the four men being held in custody were not involved in the Riverside shooting or a later fatal shooting of two police officers in the 32nd Precinct.

. Although the defendant alludes to the fact that these events were reported in the media, no articles from this period have been reproduced in the record. They were not placed in issue in the trial court and, of course, may not be considered here.

. The article states that the police had been looking for the defendant prior to the Riverside shooting because he "had disappeared the previous winter in the course of his trial” on some unidentified charge. It indicates that "he was believed to be in Algeria together with others of the Black Panther leadership who had fled the country while being sought by the police”. The article also notes that when the defendant was arrested in June of 1971 he was then engaged in the armed robbery of "an after-hours social club in the Bronx.”

. Defendant had also requested sequestration on January 30 and January 31 but on this appeal he does not challenge the court’s denial of these motions.

. The record does not disclose the number of subscribers or the circulation of New York Magazine.