**Richard MOORE, Petitioner,**

v.

**David HARRIS, Superintendent, Greenhaven Correctional Facility, Respondent.**

**No. 78 Civ. 4726.**

United States District Court, S. D. New York.

April 25, 1979.

---

The Legal Aid Soc., New York City, for petitioner; William E. Hellerstein, New York City, of counsel.

Robert M. Morgenthau, Dist. Atty., New York County, New York City, for respondent; Peter L. Zimroth, Chief Asst. Dist. Atty., Brian Rosner, Asst. Dist. Atty., New York City, of counsel.

LASKER, District Judge.

In 1973 Richard Moore was convicted in the New York State Supreme Court of the attempted murder of two New York City policemen and sentenced to a term of 25 years to life imprisonment.[1] The conviction was unanimously affirmed by both the Appellate Division, without opinion, and the Court of Appeals. 42 N.Y.2d 421, 397 N.Y. S.2d 975, 366 N.E.2d 1330, *cert. denied,* 434 U.S. 987, 98 S.Ct. 617, 54 L.Ed.2d 482 (1977). Moore now petitions for a writ of habeas corpus on the ground that he was denied his right under the Sixth and Fourteenth Amendments to trial by a fair and impartial jury because of the trial judge's failure to inquire of the jurors whether they had seen or read a magazine article prejudicial to the defense and by the presence of an auxiliary policeman on the jury. For the reasons which follow, the petition is denied.

For purposes of the issues before this court, the crime with which Moore was charged and the events leading up to his arrest and conviction, while of an unusually

---

1. Moore was also convicted of felonious possession of a weapon and sentenced to a concurrent term of seven years of imprisonment.

flamboyant nature, need not be described at length. Moore was charged with having shot and seriously wounded two policemen in an automobile chase on Riverside Drive on May 19, 1971. Several days after the shooting, two packages were delivered, one to the *New York Times* and the other to the radio station WLIB, each of which contained a license plate, a .45 caliber cartridge and a message beginning:

> "Here are the license plates sort [sic] after by the fascist state pig police. We send them in order to exhibit the potential power of oppressed peoples to acquire revolutionary justice . . . ."

On June 5th, Moore was arrested while robbing an "after hours" club in the Bronx. One of the weapons found at the scene of the arrest was a machine gun, said by a patron to have been carried by Moore, which was identified by a ballistics expert as the gun used in the May 19th shootings. The police also determined that Moore's fingerprints matched several of those on the papers left with the *New York Times.* A week after the arrest, an anonymous phone call led the police to Pauline Joseph, one of Moore's apartment mates. With Joseph's consent, the apartment was searched, revealing several documents typed on the same typewriter as the messages sent to the press, including one addressed to the police commissioner, which referred to the Riverside Drive shootings and stated: "what we have in mind is to let you know that EVERYTIME you use your guns against our people we'll use our guns against your repres-

sive forces." Joseph, although characterized by Moore as a "paranoid schizophrenic, prostitute, welfare cheat and liar of no small dimension",[2] provided crucial evidence at trial as to Moore's whereabouts and statements at the time of the shooting which strongly suggested that he was responsible for the crime.

The habeas corpus petition is directed at the jury selection for Moore's second trial, the first having been declared a mistrial when the jury was unable to reach a verdict. The second voir dire lasted twelve days, during the course of which 86 prospective jurors were questioned by counsel. As background to the issues presented here, it should be pointed out that the shooting in May of 1971, although the only such crime with which Moore was charged, was one of a number of serious attacks on policemen in the metropolitan area during this period, which generated substantial publicity. Two such incidents, which were reported in the press, occurred during the selection of the second jury. Accordingly, during the voir dire, the transcript of which is more than 1850 pages long, the jurors were questioned in depth as to their exposure to publicity relating not only to the Riverside Drive shootings but to any other incident involving an attack on police officers.

Of the 86 jurors examined, only 39 stated that they had no prior knowledge of the Riverside Drive shootings.[3] However, of the remaining 47, only 5 indicated prior knowledge that Moore had been arrested

---

2. Petitioner's Memorandum in Support of the Petition for a Writ of Habeas Corpus, p. 11.

3. Aigar, Tr. 22, 58–61, 125–35, 157–58; Rogers, 19, 22, 51–54, 98–111; Sautner, 19, 22, 85–89, 191–96; Porter, 19, 22, 61–66, 135–43; Hochbaum, 19, 22, 66–69; Krauss, 19, 22, 72–73, 159; Turner, 19, 22, 70–71; Delancy, 19, 22, 79; Lawler, 19, 22, 74–76, 176–78; Forrester, 57–58; Maloney, 200, 203, 212, 293; Flory, 200, 203, 263–64; Pagan, 200, 203, 227–32; Andrea, 201, 203, 218–20, 255; Stark, 200, 203, 239–40; Griffiths, 208–09; Bailey, 362–63, 529–41, 612, 669, 700–01, 735, 752–53, 781, 783, 785; Aloisi, 339, 342, 372–75, 614–16, 670, 697–83, 686–90, 692–95, 806; Lowengarten, 339, 342, 381–86, 613, 708–10, 736–37, 753, 755–60, 762–77, 781–85, 798, 806; Esposito, 535; Harrigan, 561;

Metzger, 847, 855, 935–40, 954–63; Jordan, 847, 1002–06, 1008; Kopka, 854, 855, 890–93, 897, 1014–21, 1055; Pritchard, 847, 855, 991–93, 995–96, 1006–08, 1044–52, 1055–56, 1085; Arum, 847, 855, 997–1000, 1060–67, 1072, 1085; Lennox, 847, 855, 900–06, 990–91, 1032–44, 1052, 1072, 1085; Elias, 870–71; Eckstein, 1008–09; Helfrick, 1085, 1087, 1123; Durham, 1085, 1087, 1090, 1099–1102, 1141–45, 1187; Gracia, 1085, 1087, 1090, 1102–05, 1145–50, 1187; Askew, 1189, 1212–15, 1227, 1255–57, 1270; Freeman, 1271, 1276–80, 1293–1304, 1353, 1356; Albrecht, 1200; Smith, 1271, 1276, 1291–93, 1338–45, 1352–53, 1356; Dashinsky, 1721F–1722; Ziegler, 1781–82; Fleischmann, 1838–39.

for the incident[4] and all 5 were challenged for cause. Nevertheless, in the course of the first nine days of the voir dire, defense counsel made close to thirty motions for a mistrial or an adjournment based on adverse publicity.[5] All of these motions were denied in rulings which are not contested here.

During the afternoon session on February 5th, one of the prospective jurors examined was a Mr. Wichik (also called Richard and Winter), a junior high school teacher who specialized in behavior counselling. While being questioned by the prosecutor, Wichik stated that defense counsel might be "concerned" to know that he had recently joined the Auxiliary Police Department. (Tr. 1285) Wichik agreed with the prosecutor that the role of an auxiliary policeman included "wearing a uniform and going into your own community unarmed" (id.), but added that he had joined "to work with the young kids in my neighborhood and try to get them, sitting on stoops, drinking beer, to enter the various community centers that we have available for them." (Tr. 1285–86) He also stated that he had joined the force six or seven weeks earlier and had not yet reported to his assigned precinct house. (Tr. 1286, 1305) Wichik stated in response to the prosecutor's questions that he did not think that he would feel an "alliance" with the two injured police officers and that he could act as an unbiased juror. (Tr. 1287)

Defense counsel's questioning of Mr. Wichik was relatively brief. (Tr. 1304–08, 1310–12) Although he examined Wichik, as he had earlier jurors, as to his prior knowledge of the crime and his views toward black militant groups, counsel touched on Wichik's membership in the auxiliary police force only briefly to elicit a promise that Wichik would not visit the precinct house during the course of the trial. (Tr. 1305–06) Nevertheless, defense counsel subsequently challenged Wichik for cause on the ground that his having joined the auxiliary

police force indicated "some faith and some belief in the mechanism of the police department" which would prevent him from being an unbiased juror. (Tr. 1350) The challenge for cause was denied. Defense counsel then exercised his one remaining peremptory challenge to exclude another juror, Mr. Smith, and noted for the record his objection to Wichik and a second juror, Mr. King. (Tr. 1351–53)

On February 6th, after eleven jurors had been empaneled, defense counsel notified the court out of the presence of the jury that he had received in the mail that morning the February 12th issue of New York Magazine, whose cover story, entitled *Target Blue, The Story Behind the Police Assassinations*, dealt at length with the shootings for which Moore was on trial. Describing the contents of the article as "shocking", defense counsel moved for a mistrial and an adjournment. (Tr. 1413–14) The motion was denied by the trial judge who relied on his repeated instructions to the jurors not to read or listen to any reports relating to the subject matter of the trial as sufficient to ensure that the jurors would avoid the article. (Tr. 1416–17) Defense counsel then argued at length that the article revealed that the police had exculpatory evidence which had been withheld by the prosecution and demanded that the author of the article, a former Deputy Police Commissioner, be examined at a hearing to determine his sources. (Tr. 1421–54) This request was also denied (Tr. 1455), and no further mention was made of the magazine article in the examination of the jurors which followed that afternoon.

On the following day, February 7th, in response to questioning by the prosecutor, the prospective twelfth juror, Mr. Meals, stated in front of the eleven empaneled jurors that he had received in his mail the current issue of New York Magazine but that upon seeing its cover, which he described as "rather graphic", he had given the

---

4. Lewis, Tr. 22–23; Granato, 24–25; Apostolidis, 206–08; Grancher, 1189–90; Vanedan, 1819–20.

5. Tr. 433, 436, 442, 450, 452, 462, 466, 462–72, 569, 582–83, 597–98, 599, 602, 606–07, 609–10, 645–46, 810, 813, 822, 823–24, 974, 979, 980, 1195–96.

magazine to a neighbor without examining its contents. (Tr. 1513–14) Defense counsel asked Meals no questions about the magazine article and did not challenge him for cause on the basis of his exposure to the cover. Meals was sworn in as the twelfth juror, and the selection of the alternate jurors began.

On the morning of February 8th, the last day of jury selection, defense counsel again raised the subject of the magazine article, requesting that "on the basis of the New York magazine article . . . this jury be sequestered." (Tr. 1656) The request was denied (id.), and the examination of the jurors continued. Following the luncheon recess, the defendant refused to appear in court. Considerable discussion ensued as to whether facilities could be made available to Moore so he could view the proceedings outside the courtroom. The suggestion was ultimately rejected by the judge. Before the jury was brought in defense counsel stated that he had "two things" to discuss with the court. One related to another case. The other consisted of a suggestion that "it would be appropriate for his Honor to ask those eleven jurors [empaneled before Mr. Meals] if they had occasion to see the [New York Magazine] article and/or to read it." (Tr. 1746) This request was denied, again on the ground that the court's repeated general admonitions not to read anything in connection with the case were sufficient safeguard. The transcript indicates that defense counsel did not press the point, and the selection of the alternate jurors was then completed. Significantly, of the 16 proposed alternate jurors examined by defense counsel after he first became aware of *Target Blue*, only 6 were asked by him whether they had seen or read the article. All of these jurors answered no.[6]

**I.**

**Failure to Question the Eleven Empaneled Jurors as to *Target Blue***

Moore argues that the New York Magazine article was so inherently prejudicial as to entitle him as a matter of constitutional right to have the judge inquire whether any of the jurors had been exposed to it.

■ A defendant is constitutionally entitled to a trial before "a panel of impartial, 'indifferent' jurors." *Irvin v. Dowd*, 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). In a number of well known cases the Supreme Court has found that the degree of inflammatory publicity surrounding a criminal trial was so pervasive that the defendant was denied his right to due process. See e. g., *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) (countless prejudicial news reports, "carnival" atmosphere at trial, and unbridled jury exposure to the media deprived murder suspect of a fair trial); *Estes v. Texas*, 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965) (intense pre-trial publicity aggravated by "live" televising of courtroom proceedings over the defendant's objections infringed the defendant's right to due process); *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) (20 minute filmed "confession" by defendant to charges of bank robbery, kidnapping and murder, which was broadcast three times over local television station, compelled change of venue.)

However, in *Murphy v. Florida*, 421 U.S. 794, 799, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975), the Court warned that these decisions do not stand for the proposition that juror exposure to news reports about the crime for which a defendant is on trial alone presumptively denies the defendant a fair trial;[7] rather the "totality of circumstances" must be considered in determining whether a trial was fundamentally unfair.

6. Castio, Tr. 1629; McDonough, 1637; Irby, 1762; Ziegler, 1788; Gaglio, 1831; Fleichman, 1843.

7. *Murphy* emphasizes in this respect that a federal court is limited to a narrow, constitutional standard of review in considering the proceedings at a state trial while it exercises a broad supervisory power of review over the proceedings at a federal trial. 421 U.S. 794, 797–98, 95 S.Ct. 2031, 44 L.Ed.2d 589.

Here, the factors to be considered in deciding whether the trial judge committed constitutional error in refusing to poll the jury include the prejudicial content of the New York Magazine article, the likelihood that the jury was exposed to it, and the adequacy of other safeguards to ensure that the jury was not unfairly influenced. See *United States v. Lord*, 565 F.2d 831, 838 (2d Cir. 1977).[8]

■ Although the question is the subject of some dispute between the parties, we find that the contents of *Target Blue* were clearly prejudicial to Moore. While it is true, as the state points out, that much of the article deals with factual matters that were ultimately put into evidence at trial, the net effect of an article, written by a former Deputy Police Commissioner, which concludes that Moore was responsible for the May 19th shootings must be considered harmful to Moore himself. Nevertheless, it is relevant in considering the trial judge's decision not to poll the jury, that defense counsel's reaction to the article during the voir dire, far from being unreservedly negative, was to argue strenuously that it contained exculpatory information.[9] This response is evidence that defense counsel considered the prejudice of the article to be offset and therefore limited.

The state also contends that the circulation of New York Magazine in 1973 was so small that it was highly unlikely a juror would have been exposed to the article.

Moore introduced no evidence as to the magazine's circulation to support his application during the voir dire. He now represents, however, that the issue in question had an estimated circulation of 85,500 in Manhattan,[10] a county which, in 1970, had a population of 1,500,000.[11] In contrast, the cases which he relies on involved far more publicity which was pervasive in the trial community. For example, in *United States v. Lord, supra*, 565 F.2d 831, several articles describing a brutal attack on a key government witness were published in the only morning newspaper of general circulation in the area in which the trial was held. In *United States v. Perrotta*, 553 F.2d 247 (1st Cir. 1977), the only evening newspaper in Springfield, Massachusetts, carried a front page headline as to the trial judge's preclusion of prejudicial evidence in a local criminal trial. See also *United States ex rel. Greene v. New Jersey*, 519 F.2d 1356 (3d Cir. 1975) (two county newspapers carried story of defendant's rejected attempt to plead non vult to murder charge); *United States v. Pomponio*, 517 F.2d 460 (4th Cir. 1975) (two articles describing at length defendants' alleged criminal activities, not the subject of their trials, appeared in major area newspaper.) Accordingly, the prejudice of *Target Blue* to Moore, although undeniable, was limited by exculpatory material in the article and by the magazine's small circulation.

8. "The guidelines to be followed by a district court confronted with the problem of publication or broadcast of information concerning an ongoing criminal trial have been indicated by us. . . .

"First the court must decide whether the publicity contains potentially prejudicial information, and whether the members of the jury might have been exposed to it. If the broadcast or article contains no information beyond the evidence in the case, or if the information is clearly innocuous or the possibility of the jury's exposure to it is remote, further inquiry may not be necessary. If, however, the court determines that the article or broadcast has a potential for unfair prejudice, then an initial inquiry of the jury is necessary to ascertain whether any of its members have been exposed to the information." (citations omitted)

9. Defense counsel also relied on substantial portions of the article at trial in cross-examining the prosecution's major witness (Trial Tr. 1047–50, 1059–60, 1070, 1071–73, 1796–97) and argued on appeal that the trial judge erred in not granting a hearing to determine the sources of the article. (See Moore's Appellate Division brief, pp. 117–18; Court of Appeals brief, p. 96).

10. Petitioner's Memorandum, p. 20 n. 5 (quoting from a letter to the Legal Aid Society from Bob Brodeur of New York Magazine).

11. Memorandum in Opposition to Petitioner's Application for a Writ of Habeas Corpus, p. 35 (citing the World Almanac of 1978, p. 217).

The manner in which the voir dire was conducted was also calculated to steer the jurors away from adverse publicity. The transcript indicates that the judge allowed counsel wide latitude in questioning jurors and that the jurors were repeatedly examined about their exposure to prejudicial news accounts. By the time defense counsel suggested that the jurors be questioned about *Target Blue*, the trial judge had already issued no less than sixteen warnings to the jurors not to read or listen to any material relating to the subject matter of the trial.[12] Moreover, the statement of the twelfth juror, Mr. Meals, in open court that the current issue of New York Magazine contained an article about the shootings for which Moore was on trial was certainly a special warning that this article was to be avoided. In light of this extraordinary and definite preoccupation with pretrial publicity, we find that the trial judge was correct in deciding that the general safeguards already taken were adequate to ensure the impartiality of the jury without special questioning as to *Target Blue*.

A further factor to be considered in determining the propriety of the trial judge's decision not to poll the jury is the manner in which defense counsel requested this relief. Moore's lawyer appears to have been an able and, to say the least, forceful protector of his client's interests. During the course of the voir dire he made approximately 70 motions on Moore's behalf,[13] many of which he argued with extreme persistence. By contrast, the manner in which he asked that the jury be polled can only be described as casual. The request was made two and a half days after counsel first discovered the article and even then was presented only in passing as the last of three motions. When the request was denied, counsel registered no opposition. (Tr. 1746–47) The routine manner in which the application was made not only bears on the degree of seriousness with which the trial judge could be expected to view the request but also suggests that even zealous defense counsel did not consider polling the jury a necessary safeguard. This interpretation is borne out by defense counsel's later failure to question 10 of the 16 prospective alternate jurors about their familiarity with the article.

Accordingly, we find that the voir dire as a whole was conducted with a high degree of sensitivity to the possibility of unfair influence on the jury. Certainly the offhand manner in which defense counsel applied to have the jury polled as well as the failure to make a showing that the jurors were likely to be exposed to the article did little to suggest that the already considerable safeguards taken by the trial judge were inadequate. Nor do the circulation figures now relied on by Moore, which suggest no more than a limited possibility that a juror might have come across *Target Blue*, establish that greater precautions were required to ensure the impartiality of the jury. While it would always be the safer course to poll the jurors, if for no other reason than to foreclose such litigation as this, we conclude that the failure to do so here did not amount to constitutional error.

## II.

**Presence of an Auxiliary Policeman on the Jury**

▆ Moore also contends that he was denied a fair trial by the presence of an auxiliary policeman on the jury. He argues that because of the "commonality of experience" between auxiliary policemen and regular members of the force, juror Wichik could not render an impartial verdict in a case involving a violent attack on police officers.[14]

12. Tr. 84, 232, 390, 400, 572, 666–67, 674, 807–08, 907 08, 1079 80, 1130·31, 1192, 1390, 1533, 1654 55, 1740.

13. See, e. g., Tr. 416, 442, 426 31, 589 93, 824–31, 849 51, 918, 948 53, 970 72, 1413·14, 1421, 1430–43, 1443–54, 1498–1502, 1656, 1743–44, and note 12 *supra*.

14. The state argues that Moore contested Wichik's presence on the jury before the state courts on the ground of personal bias (in viola-

Courts have occasionally inferred that the status or experience of a prospective juror was such that his presence on the jury deprived the defendant of a fair trial. See *Jackson v. United States*, 129 U.S.App.D.C. 392, 395 F.2d 615 (1968) (juror who had had affair with woman killed by her husband could not sit on trial of man charged with murdering his wife in retaliation for an extra-marital affair); *United States ex rel. DeVita v. McCorkle*, 248 F.2d 1 (3d Cir. 1957) (recent victim of robbery similar in manner to that for which defendant on trial could not render an unbiased verdict). However, the Court of Appeals of this Circuit has been reluctant to exclude a juror on the basis of status alone. As the court stated in *Mikus v. United States*, 433 F.2d 719, 724 (2d Cir. 1970), in response to a claim that the appellant had been denied his constitutional right to a fair and impartial jury:

> "This court does not choose to create a set of unreasonably constricting presumptions that jurors be excused for cause due to certain occupational or other special relationships which might bear directly or indirectly on the circumstances of a given case, where, as here, there is no showing of actual bias or prejudice. See *United States v. Haynes*, 398 F.2d 980, 983–986 (2d Cir. 1968), cert. denied, 393 U.S. 1120, 89 S.Ct. 996, 22 L.Ed.2d 124 (1969)"

Moreover, the court has held that trial judges are to be accorded "broad discretion . . . to determine bias of jurors on challenges for cause." *United States v.*

*Ploof*, 464 F.2d 116, 118 (2d Cir. 1972); *accord, Mikus v. United States, supra,* 433 F.2d at 724; *United States v. Haynes*, 398 F.2d 980, 984 (2d Cir. 1968).[15]

There is no evidence in the record of actual bias on the part of juror Wichik. Both counsel were given extensive opportunity to question him, and his answers indicate without exception an unhesitating willingness to view the case impartially. Nor does his status as an auxiliary policeman, on the facts here, support an inference of implied bias. Although the petitioner makes much of the fact that auxiliary policemen are used "to patrol the streets, observe and report and to act 'as crime preventors . . .'" (Petitioner's Memorandum, p. 26), Wichik's statements during the voir dire indicate that he viewed his membership in the auxiliary police as an extension of his regular work, counselling teenagers, rather than as a more traditional peace-keeping function. Furthermore, at the time he joined the jury his participation in the auxiliary police was remarkably limited: he had become a member only six or seven weeks earlier and had yet to report to his precinct house. Under these circumstances, we find that the trial judge was correct in concluding that Wichik did not consider himself to be "on the same team" as the two injured policemen.

A further consideration in support of our conclusion is, again, defense counsel's questioning during the voir dire. While not at all careless, his examination of Wichik was nevertheless casual. The short questioning

tion of New York Criminal Procedure Law § 270.20(1)(b)) and not, as here, on the basis of Wichik's association with the Police Department (in violation of § 270.20(1)(c)). Accordingly, it contends that, in the absence of a showing of good cause and actual prejudice, *Wainwright v. Sykes*, 433 U.S. 72, 97 S.Ct. 2497, 53 L.Ed.2d 594 (1976), *Francis v. Henderson*, 425 U.S. 536, 96 S.Ct. 1708, 48 L.Ed.2d 149 (1976), Moore is barred from asserting the new claim here. However, the question of Wichik's relationship to the police was raised below since defense counsel's challenge for cause was predicated on Wichik's membership in the auxiliary police (Tr. 1350) and Moore's brief before the Court of Appeals contended that:

"THE COURT'S REFUSAL TO DISMISS FOR CAUSE THREE PROSPECTIVE JUR-

ORS WITH EXCEPTIONALLY CLOSE RELATIONSHIPS TO LAW ENFORCEMENT WAS A DENIAL OF DUE PROCESS UNDER THE FOURTEENTH AMENDMENT AND REVERSIBLE ERROR UNDER C.P.L. § 270.-20(1)(c)." (Brief of Defendant-Appellant, p. 61)

This claim was rejected, although without discussion, on the merits by the Court of Appeals. 42 N.Y.2d 421, 435, 397 N.Y.S.2d 975, 366 N.E.2d 1330 (1977).

15. These decisions refer to federal trial judges. However, in view of the greater limitations on federal review of state as opposed to federal trial proceedings, *see* note 7 *supra, a fortiori,* a federal court would accord similar "broad discretion" in such matters to state trial judges.

(6 pages of transcript) touched only briefly on Wichik's status as an auxiliary policeman and evidenced no particular alarm at this fact. All that defense counsel asked of Wichik in connection with his membership on the auxiliary police force was that he not visit the precinct house during the trial, before moving on to other topics.

In contrast, defense counsel's examination of the juror immediately following Wichik, Mr. King, whose nephew was a federal narcotics officer, his work supervisor a retired policeman and who had himself been a member of the Military Policy during his army service, probed at great length (26 pages) into those factors. (Tr. 1312–38) Similarly, when discussing challenges for cause, counsel pressed the case against King far more forcefully than the case against Wichik, although now he does not contest King's service on the jury. (Tr. 1345–51) Moreover, it is significant that defense counsel exercised his one remaining peremptory challenge to remove neither Wichik nor King but a third juror, Mr. Smith, whose only apparent blemish was that he was the employer of two former policemen. (Tr. 1352–53) These circumstances, singly and collectively indicate that even defense counsel did not perceive the presence of Wichik on the jury as a significant threat, and we conclude that it was not and that the trial judge did not err in refusing to dismiss him for cause.

While it is inevitable in a proceeding of this complexity that certain safeguards will appear, in hindsight, to have been overlooked, we find no merit to Moore's claim that the jury selection here was so unfair as to deprive him of his right to trial by an impartial jury. On the contrary, we find that, despite an unusually large number of problems, the voir dire in this case was conducted with care and patience. Accordingly, the petition is denied.

It is so ordered.