■ THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v JENNIFER BARTHOLOMEW, Appellant. [963 NYS2d 630]—

Judgment, Supreme Court, New York County (Lewis Bart Stone, J.), rendered April 24, 2009, convicting defendant, after a jury trial, of promoting prison contraband in the first degree, and sentencing her to a prison term of 1 to 3 years, reversed, as a matter of discretion in the interest of justice, and the matter remanded for further proceedings.

This case involves allegations that defendant, a former correction officer, used a shoebox containing sneakers to smuggle a knife into the Manhattan Detention Complex (MDC) for the purpose of giving the contraband to her boyfriend, James Wright, an inmate.

During cross-examination of defendant, the prosecutor introduced irrelevant and inflammatory considerations that had no legitimate bearing on defendant's credibility or any other issue in the case. The prejudicial effect of these lines of questioning was compounded by the trial court's instruction that the

jury could consider that evidence in evaluating defendant's credibility. Although defendant's objections were only partially preserved, given the gravity of the errors in this case and their undeniably prejudicial effect, we reach these issues in the exercise of our interest of justice jurisdiction (*see* CPL 470.15 [3] [c]; *People v Council*, 52 AD3d 297 [1st Dept 2008], *lv dismissed* 10 NY3d 957 [2008]; *People v Engstrom*, 86 AD3d 580 [2d Dept 2011]).

The criminal history of defendant's boyfriend was irrelevant to whether defendant "knowingly and unlawfully introduce[d] any dangerous contraband into a detention facility" (Penal Law § 205.25 [1]). The fact that Wright was a gang member with an extensive criminal history has no bearing on whether or not defendant knew she was introducing dangerous contraband into the facility, and could only serve to inflame the jury and prejudice defendant. As defendant correctly argues, this evidence served "no purpose but to suggest that defendant was associated with a disreputable person" (*People v Ortiz*, 69 AD3d 490, 491 [1st Dept 2010] [error for prosecutor to refer on cross-examination to defendant's non-testifying girlfriend's criminal history and to introduce her mugshot, notwithstanding meritless argument that girlfriend's recent arrest tended to support a missing witness inference]; *People v Shivers*, 63 AD2d 708, 709 [2d Dept 1978] [reversing conviction after defendant, who had no criminal record, was cross-examined about her husband's criminal record, noting "(t)he tactic employed by the prosecutor was grossly prejudicial to defendant's right to a fair trial and should not have been allowed . . . he was not entitled to deliberately attempt to associate defendant with her husband's criminal record"]).

The People's putative rationales for putting Wright's criminal history before the jury do not withstand scrutiny. Since the knife was inherently dangerous, Wright's criminal history was not necessary to establish that it was "dangerous contraband" within the meaning of the statute. Although the trial court recognized that the identity of the recipient was irrelevant to the determination of whether defendant knowingly introduced a knife into the system, precluding the introduction of such evidence on the People's direct case, the court later abandoned this sound position. The court ruled, prior to defendant's cross, that the People could "go into her knowledge of [Wright's] criminal record or anything of that nature," and inexplicably instructed the jury that it could use Wright's criminal history in assessing defendant's credibility, essentially allowing the jury to dismiss defendant's testimony based on her poor judgment in romantic partners.

Cross-examination of defendant concerning her knowledge of Wright's gang membership also served no purpose but to suggest that she was affiliated with a disreputable person. Cross-examination of a defendant about his putative gang membership, absent a connection between the membership and the crime, is prohibited; a fortiori, cross-examination of a defendant about *a friend's* gang membership is even less relevant.

Similarly, periods of unemployment during which defendant was on public assistance were irrelevant and had no bearing on her credibility. Although the trial court found that the evidence of defendant's receipt of public assistance served to give the jury a complete picture of her work history, it would have sufficed for the prosecutor to have elicited that defendant had been unemployed for brief periods. It was not necessary to ask questions about going "to the welfare office" that might serve to prejudice some jurors. Being on public assistance cannot constitute a "prior bad act" for purposes of cross-examination, and the matter was not relevant to any of the issues in the case. Since there was no evidence that defendant fraudulently procured benefits or misrepresented her eligibility, it was error for the prosecutor to attempt to impeach her through questioning about visiting the welfare office. The court compounded this error by instructing the jury that it could consider defendant's receipt of public assistance in evaluating her credibility.

The trial court also erred in permitting the prosecutor to ask defendant, over counsel's objection, to retrieve the phone number of her boyfriend's mother from her cell phone's memory during cross-examination. The demand left the jury with the impression that defendant had a duty to provide the number, wrongfully suggesting that defendant had impeded the prosecutor's case by failing to furnish the number. Since defendant had no duty to provide the number, this line of questioning was patently unfair and constituted improper burden shifting under the circumstances.

The cumulative effect of these errors cannot be dismissed as harmless. The combined effects of these errors served to deprive defendant of her fundamental right to a fair trial and require reversal of the judgment.

In light of our holding, it is unnecessary for us to reach defendant's further contention as to whether the court properly exercised its discretion in replacing a sworn juror with an alternate juror. Concur—Moskowitz, Freedman and Manzanet-Daniels, JJ.

Andrias, J.P., and Friedman, J., dissent in a memorandum by Friedman, J., as follows: I am compelled to dissent from the

reversal of this conviction. The rulings at trial concerning the scope of the People's cross examination of defendant that the majority finds to constitute reversible error—even assuming that these rulings were, indeed, erroneous—were harmless in view of the overwhelming evidence of defendant's guilt. So overwhelming was the uncontroverted evidence of defendant's guilt, and so ludicrous was her testimony attempting to explain away that evidence, that one can only conclude that there is no significant probability that the jury would have acquitted defendant had the People not been permitted to explore the matters in question in cross-examining defendant (*see People v Crimmins*, 36 NY2d 230, 241-242 [1975]). In determining whether any errors at trial were harmless, it should of course be considered whether defendant offered a "ridiculous explanation" as her defense against a prosecution case based on undisputed evidence (*see People v Hall*, 18 NY3d 122, 132 [2011]; *People v Wilson*, 93 AD3d 483, 484 [1st Dept 2012], *lv denied* 19 NY3d 978 [2012]). This the majority completely fails to do. Indeed, as discussed more fully below, the majority reverses the conviction without engaging in any meaningful harmless-error analysis at all—essentially buying the bridge that the jury rejected.

Defendant, a former correction officer, was convicted of the crime of promoting prison contraband in the first degree, which is defined in relevant part as "knowingly and unlawfully introduc[ing] any dangerous contraband into a detention facility" (Penal Law § 205.25 [1]). The People's direct case was based on the testimony of correction officers who had been on duty at the relevant time at the Manhattan Detention Complex (MDC), where defendant's then-boyfriend, James Wright, was in custody. Defendant never raised any challenge to the accuracy or credibility of the testimony of these officers. Accordingly, the People established that, on January 17, 2008, defendant showed up at the visitors' entrance to MDC with a bag of items for Wright. The officer on duty told her that weapons and cell phones, among other items, could not be brought into the facility. At this point, defendant told the officer that she knew that cell phones were not permitted because she herself was a former correction officer, but she had nonetheless brought a cell phone with her. Defendant went to put the cell phone somewhere else and then returned to the entrance, whereupon the officer allowed her inside. The officer then removed the items in the bag for inspection. One of the items was a beaten-up shoebox. When the officer opened the shoebox, she found inside a pair of sneakers, and observed an object that looked like a "stick" inside one of the shoes. She removed the object and found that

it was a kitchen knife. Defendant, who claimed that she had just bought the shoes and had not known about the knife, was arrested.

To reiterate, defendant made no attempt at trial to challenge or discredit any of the testimony against her. Instead, she took the stand in her own defense. She testified that she had received a call from Wright on the morning of the day in question, in which he asked her to bring him some clothing and a pair of sneakers that would comply with MDC regulations. That afternoon, she went to VIM, a discount store in Brooklyn, to buy the items Wright had requested. In the sneaker department, she found "hundreds and hundreds of boxes" stacked "on top of each other." She grabbed a shoebox marked with Wright's size from the middle of a stack. She purchased the box, which did not appear brand new, without ever looking inside, although, as a former correction officer, she knew that inmates at MDC were permitted to wear only white sneakers. She testified that she did not know there was a knife in the shoebox until the box was inspected at MDC.

Defendant, while not denying that there was a knife in the shoebox she was bringing to her boyfriend at MDC, offered a self-evidently absurd explanation for the presence of the knife. She asked the jury to believe that it was entirely a matter of bad luck and sheer coincidence that, out of the hundreds of shoeboxes on sale at VIM, she had chosen to buy for her boyfriend the one shoebox that just happened to have a knife in it. Through a further twist of bad luck, she had not thought to look inside the shoebox before bringing it to MDC, although she was well aware that only white sneakers were permissible. It is difficult to imagine any jury naive enough to believe this story, let alone a jury of New Yorkers.

In light of the overwhelming evidence of defendant's guilt, any prejudice to her from the trial rulings of which she complains pales into insignificance. Regarding the court's ruling permitting the People to question defendant about Wright's criminal record, it seems to me that Wright's history of violent crime was arguably relevant to the People's direct case insofar as it tends to show that he had a motive to ask defendant to bring him a weapon (*see People v Moore*, 42 NY2d 421, 428 [1977] [evidence of a person's motive is admissible even if it reflects negatively on that person's character], *cert denied* 434 US 987 [1977]). The trial court, while it did not permit the People to offer evidence of Wright's criminal history as part of their direct case, seems ultimately to have come to this conclusion, since, in permitting the People to question defendant about

this matter on cross-examination, it observed that Wright's record might be relevant "in the context of [determining] why [defendant was bringing him] a knife, as distinct from a piece of celery, or drugs, or anything else."

While the majority correctly states that Wright's criminal record was not admissible to impeach defendant's credibility (*see People v Ortiz*, 69 AD3d 490, 491 [1st Dept 2010]), defendant never objected to the court's instruction directing the jury to consider that evidence only for the purpose of evaluating her credibility.* In any event, given that it was no secret that Wright was being held at MDC (and thus obviously had been arrested), any additional prejudice that might have accrued to defendant from the jury's learning that this was not Wright's first encounter with the criminal justice system would have been minimal. In this regard, the prosecutor never once mentioned Wright's record of convictions or arrests in his summation. Again, whether there was any reasonable possibility that defendant would have been acquitted but for the error, if any, in permitting the People to question her about Wright's criminal history must be assessed against the background of the overwhelming proof of her guilt and the absurdity of her attempt to explain that proof away. For example, in *People v Sellan* (143 AD2d 690, 691 [2d Dept 1988], *lv denied* 73 NY2d 860 [1988]), the Second Department affirmed a conviction notwithstanding the trial court's error in permitting the prosecutor to cross-examine the defendant about his gang membership, which had no connection to the crime charged. The *Sellan* court found that "in light of the compelling proof of guilt, . . . there was no reasonable possibility that the jury would have acquitted the defendant had this evidence not been introduced" (143 AD2d at 691). Notably, the majority fails even to discuss *Sellan*.

The majority finds that the trial court also erred in permitting the People, upon their cross-examination of defendant, to bring out that she had been on public assistance during periods of unemployment and to ask her to retrieve the phone number of Wright's mother from her cell phone. Here, again, any error must be deemed harmless, given the compelling proof of defendant's guilt. Nor is it clear that any error was involved in these rulings. In her direct testimony, defendant described her educational and work history, without mentioning her periods of unemployment and receipt of public assistance, creating the impression that she had never been unemployed. It was only

---

* Indeed, given the admission of evidence of Wright's criminal record, the instruction limiting the jury's use of such evidence to the evaluation of defendant's credibility was actually favorable to defendant.

fair to permit the prosecution to give a more complete picture on cross-examination, and to instruct the jury that this matter could be considered in evaluating defendant's credibility. The request that defendant retrieve the phone number of Wright's mother was part of the People's entirely permissible (but ultimately unsuccessful) attempt to establish grounds for a missing witness charge with regard to Wright (plainly, a material witness in the case). I see no basis for the majority's speculation that the request for the phone number somehow "left the jury with the impression that defendant had a duty to provide [it]" and "constituted improper burden shifting under the circumstances."

The majority's writing is unbalanced in that it devotes its attention exclusively to the alleged errors of which defendant complains while simply asserting, in conclusory fashion and without supporting analysis, that those errors were harmful to defendant. The sum total of the majority's discussion of the harmless error issue is as follows: "The cumulative effect of these errors cannot be dismissed as harmless. The combined effects of these errors served to deprive defendant of her fundamental right to a fair trial and require reversal of the judgment." The majority seems to regard the alleged errors as if they rose to the level of an error in the mode of proceedings, and therefore could be deemed to require a new trial regardless of the strength of the People's case. Of course, the alleged trial errors of which defendant complains were simply evidentiary in nature and, therefore, would warrant a reversal only if there were a significant probability that she would have been acquitted but for the making of those errors (see Crimmins, 36 NY2d at 241-242). Plainly, one cannot assess whether this is the case without analyzing the strength of the People's case. The majority offers no such analysis, instead choosing to ignore both the undisputed evidence the People presented against defendant and defendant's ludicrous attempt to explain away that undisputed evidence in a manner consistent with her innocence. The majority never addresses the basic question that the doctrine of harmless error requires us to answer about this case, namely, but for the errors in question, is there a significant probability, or even a reasonable possibility, that the jury would have credited defendant's claim that she had no idea there was a knife in the shoebox that she purchased and brought to MDC for her boyfriend? The question fairly answers itself, which is presumably why the majority cannot bring itself to face it.

In sum, this is a case in which the defendant has admitted that she brought a shoebox to MDC that turned out to contain a

knife. The only issue is whether she did so knowingly. The circumstances show compellingly that she did. In order to refute the inescapable inference that she knew there was a knife in the shoebox, she presented a story that would be credible only to the sort of person who could be persuaded to buy the Brooklyn Bridge. Unfortunately, the majority, by fastening on rulings that were at most insignificant trial errors (if they were errors at all) in order to reverse, buys the bridge that the jury did not. It seems to me that what the majority points to is hardly the sort of matter that warrants the expenditure of scarce judicial and prosecutorial resources for a retrial.

In view of the foregoing, and given that I also see no merit in defendant's remaining contention, I would affirm the judgment of conviction.