OPINION AND ORDER
 

 MUKASEY, District Judge.
 

 On the evening of July 10, 1972, Samuel Charles, a black male, was stabbed to death in the vicinity of 45th Street and Broadway. On June 14, 1984, petitioner Warren Schur-man, who is white, was indicted for the murder and was subsequently convicted after trial and sentenced to an indeterminate prison term of from 25 years to life. He appealed his conviction to the Appellate Division, where it was summarily affirmed. The Court of Appeals denied petitioner leave to appeal.
 

 He seeks habeas corpus on several grounds: (1) the 12-year delay between the murder and his indictment denied him due process; (2) the prosecution improperly solicited hearsay testimony from one of its witnesses that petitioner had been a suspect in the crime in 1972; (3) the prosecution improperly bolstered witnesses’ credibility prior to cross-examination by soliciting testimony about its chief witness’s cooperation with federal authorities and placement in the federal witness protection program, as well as about petitioner’s alleged attempts on that witness’s life; (4) the prosecution elicited testimony about an uncharged assault on a black man by petitioner, which improperly tended to show a criminal disposition and tendency towards violence; and (5) the prosecutor made inflammatory statements in his opening and his summation that the alleged crime was racially motivated. For the reasons discussed below, petitioner’s writ for habeas relief is denied.
 

 I.
 

 The facts are as follows: On the night of July 10, 1972, Bernard Schneider, a cab driver, was parked on 46th and Broadway. At about 8:30 p.m., Samuel Charles opened the door of the cab, told Schneider that he had been stabbed and asked if Schneider would take him to the hospital. On the way to the hospital, Charles lost consciousness. He died several days later, without regaining consciousness, of a stab wound to the heart.
 

 The police were informed at about 10:00 p.m. that an individual had been brought to the hospital with a stab wound in his chest, and Detective Louis Richardson began an investigation. After talking to Schneider, he traced Charles to a parking lot at 137 West 45th Street where he worked. The police then began interviewing people in the area, including people in The Broadway Pub, a restaurant/bar next door to the parking lot. The only material information Richardson learned was that on the night he was murdered, Charles had been involved in an altercation with Alfred Ianniel-lo, the owner of The Broadway Pub.
 

 The case was actively investigated for about two or three weeks. Toward the end of the second week, Detective Richardson received information from F.B.I. Special Agent Corrigan that an informant Corrigan was using had told him that he had heard from one of his sources that a person named Frank Schurman stabbed Charles.
 
 *996
 
 (Singer Hr., Corrigan Testimony at 5) The informant provided a physical description of Schurman. (Singer Hr., Corrigan Testimony at 13) The informant told Corrigan that Charles and Ianniello had gotten into a fight, and that Ianniello asked Schurman if he would kill Charles. Schurman then stabbed Charles. (Singer Hr., Corrigan Testimony at 20) Corrigan did not speak to the informant’s source or learn his name, and did not provide Richardson with the informant's name. (Singer Hr., Corri-gan Testimony at 7-9) The informant’s source was not an eyewitness, but rather got his information from somebody else. (Singer Hr., Corrigan Testimony at 23)
 
 [1]
 
 Richardson checked police records and came up with a picture and last known address for “Frank Warren Schurman.” He went to that address with the picture and spoke to the building’s superintendent, who did not recognize the individual in the picture. (July 8th Hr. at 20-24) Richardson stopped pursuing this lead, judging it to be merely a rumor. He did not return to The Broadway Pub to question people there about a Frank Schurman, nor did he check the District Attorney’s office or criminal court records for other information about Schurman. The investigation then lay basically dormant.
 

 In late 1983 or early 1984, F.B.I. Special Agent Edward Woods contacted Detective Kennedy, who was at that time responsible for the Charles murder investigation, and informed him that he had witnesses who could provide information about the murder. Although Woods had had this information since December 1982, he did not disclose it for fear of disrupting a sensitive undercover investigation one of the witnesses was involved in.
 

 The witness who was at that time cooperating with Woods was Edward Maloney, who in 1972 was one of petitioner’s close friends — in fact, petitioner lived on and off with Maloney and Linda Boyce, Maloney’s girlfriend at that time. After interviewing Maloney and other witnesses who came to light through Woods, Kennedy turned his information over to the District Attorney’s Office. Petitioner was indicted on June 14, 1984.
 

 At trial, Maloney testified that on July 10, 1972, he and petitioner went to The Broadway Pub between 7 and 9 p.m. for dinner and drinks. (Tr. at 179) Maloney and petitioner were good friends and regular patrons of The Broadway Pub. On that night, Maloney and petitioner were drinking at the bar when Allie Ianniello, the owner of the bar, came into the bar, upset that “this nigger,” Samuel Charles, who worked in a nearby parking lot, had cursed him out. (Tr. at 179) According to Malo-ney, petitioner seemed “really disturbed” that Ianniello was so upset, and told Malo-ney, “I’m going to go outside and take care of this guy.” (Tr. at 180) Maloney testified that he told petitioner to forget about Charles, but petitioner took out a knife and told Maloney that he was going outside to stab him. (Tr. at 180) Schurman left the bar, while Maloney stayed inside waiting for him to return. After about five minutes, Maloney headed outside, where he saw a disturbance in the street, although he saw no one injured and that Schurman was no longer there. (Tr. at 181) He then returned to the bar.
 

 Some time later that evening, some one came into the bar and said that there had been a stabbing. (Tr. at 181) Maloney testified that he then left the bar and went to Schurman’s apartment, where he found Schurman lying on the couch, reading Playboy. He testified that he asked petitioner why he was still there, and petitioner responded: “Nobody’s going to worry about that nigger, so I killed him, so what.” (Tr. at 182) Maloney testified that petitioner told him that he had walked up to Charles, asked him what he had said to Ianniello, and then stabbed him in the chest. (Tr. at 182) He also said that he may have stabbed him in the back as Charles was attempting to get away.
 

 Maloney advised petitioner that he could not stay where he was and volunteered to get money from Ianniello to allow him to
 
 *997
 
 get out of town. He testified that he proceeded to do so, getting $1500 from Ianniel-lo to give to Schurman. (Tr. at 183) Nevertheless, petitioner chose not to leave, and Maloney continued to see him. According to Maloney, petitioner came by his apartment many times, and within several days of the murder, discussed the killing unabashedly in front of Boyce.
 

 Boyce, now Maloney’s ex-wife, also testified at trial. Although her recollection was somewhat at odds with Maloney’s, she confirmed that petitioner had discussed the killing in her presence. She testified that on the night the murder occurred, she accompanied Maloney and petitioner to The Broadway Pub, and that no commotion was made by Ianniello. (Tr. at 356-57, 362) She and Maloney went home by cab at approximately 10:30 or 11:00 p.m. (Tr. at 360-61) Some time after 11:00 p.m., petitioner rang the bell at their home. He appeared agitated and told them that he had stabbed a “yom,” apparently referring to “a black person.” (Tr. at 344, 360, 369-70)
 

 There was also testimony that petitioner was involved in a second assault on a black man, in which petitioner admitted to having killed Charles. Maloney testified that there came a time after the murder that he, petitioner, Robert Cordice and a friend of Cordice’s were driving in Brooklyn. A van driven by a black man cut them off. Cord-ice, who was driving, chased the van and stopped it at a light.
 
 [2]
 
 Schurman jumped out of their car, opened the door to the van, and held a knife to the throat of the driver. Maloney pulled petitioner away, while petitioner exclaimed, according to Cordice’s testimony at trial: “I’ll kill this fucking nigger, I’ll cut him up and throw him in the water,” and “[I] would have done to that nigger what [I] had done to the other nigger,” and that “I will cut that nigger up the way I cut the other nigger up.” (Tr. at 277-78, 316-18) Both Cordice and his friend asked Maloney if petitioner was crazy. Maloney testified that he told them that petitioner was good with a knife, and that had they not stopped him, he would have done to “that nigger what he had done to the other nigger.” (Tr. at 189) Maloney then told the others about petitioner murdering Charles. Maloney testified that petitioner then admitted killing Charles to Cordice and his friend, although Cordice’s testimony does not corroborate this. Cordice testified that he was not sure who petitioner was talking about when he said “that other nigger” until Maloney explained it, and that he was not sure petitioner was listening during that explanation. (Tr. at 318-19, 324-325)
 

 Maloney testified on direct examination that he sought federal protection after an incident in July 1982. According to Maloney, petitioner had joined him in a bar, then left temporarily, telling Maloney to wait for him to return. While Maloney waited, he was shot twice in the head. He then met with Special Agent Woods and on July 16, 1982, entered into a cooperation agreement with the F.B.I. (Tr. at 166-70) In exchange for his cooperation, the government allegedly offered him protection. Nevertheless, on October 2, 1982, Maloney was shot again, seven times, by someone both he and petitioner knew, in the head, throat, face, back, shoulder, and arm. (Tr. at 175) He testified that he then entered the federal witness protection program.
 

 Petitioner rested at the close of the government’s case-in-chief. After deliberating, the jury convicted him of the murder of Samuel Charles.
 

 II.
 

 Petitioner argues that the 12-year delay between the crime and his indictment violated his right to due process. According to petitioner, the delay prejudiced him in presenting an adequate defense. Witnesses to the stabbing were no longer around to substantiate or refute the prosecution’s testimony, and the recollection of the witnesses who testified was clouded. Hospital records were also no longer available to refute or substantiate Maloney’s testimony. Although Maloney testified that petitioner told him that he had stabbed Charles in
 
 *998
 
 both the chest and, he believed, in the back, the evidence showed a stab wound only in Charles’ chest.
 

 Petitioner argues that the discrepancies between Maloney's and Boyce’s testimony is further indication of the prejudice that arose from the delay. According to petitioner, the jury should not have been allowed to convict him based on the hazy memories and “incredible” testimony of these two witnesses.
 

 At petitioner’s request, the state trial court held a hearing under
 
 People v. Singer,
 
 44 N.Y.2d 241, 405 N.Y.S.2d 17, 376 N.E.2d 179 (1978), to determine whether the indictment should be dismissed because of the delay. After hearing the testimony of the detectives assigned to the case, and applying the factors articulated in
 
 People v. Taranovich,
 
 37 N.Y.2d 442, 373 N.Y.S.2d 79, 335 N.E.2d 303 (1975), the trial judge ruled that although the delay in this case was “enormous,” there was no basis to dismiss the indictment. She explained that “until whatever, 1982, or so, ’83 — I don’t remember exactly,” the police did not have ground for probable cause to arrest the defendant. She saw no indication that they would have, even if they had acted differently in pursuing the rumor that “Frank Schurman” had committed the murder. She ruled that there was no particular prejudice to petitioner, other than the prejudice that always flows from delay, and that because the crime charged was so serious, the length of the delay can be longer, and the reason for it weaker, before the indictment must be dismissed. (Sept. 18, 1985 Hr. at 25)
 

 As petitioner noted in his brief, the federal constitutional standard for dismissal of the indictment because of pre-indictment delay is considerably less flexible than New York’s standard, as articulated in
 
 Taranovich, supra.
 
 Yet only an error that amounts to a violation of the federal constitution can serve as the basis for a writ of habeas corpus. 28 U.S.C. § 2254(a). Consideration of whether New York’s standard was properly applied is therefore neither necessary nor appropriate on this petition.
 

 Delay between the crime and the indictment is wholly irrelevant under the Speedy Trial Clause of the Sixth Amendment.
 
 United States v. Marion,
 
 404 U.S. 307, 320, 92 S.Ct. 455, 463, 30 L.Ed.2d 468 (1971). Petitioner must therefore base his claim on the Due Process Clause, which plays only a limited role in protecting against oppressive delay.
 
 United States v. Lovasco,
 
 431 U.S. 783, 789, 97 S.Ct. 2044, 2048, 52 L.Ed.2d 752 (1977). Delay justifies dismissal of the indictment under the Due Process Clause only when the defendant can show both actual prejudice and that compelling him to stand trial despite the delay “violates those ‘fundamental conceptions of justice which lie at the base of our civil and political institutions’ ... and which define ‘the community’s sense of fair play and decency.’ ”
 
 Id.
 
 at 789-90, 97 S.Ct. at 2049. Such cases may arise if the government causes the delay solely to gain tactical advantage over the accused, or if the government incurs delay “in reckless disregard of circumstances, known to the prosecution, suggesting that there existed an appreciable risk that delay would impair the ability to mount an effective defense.”
 
 Id.
 
 at 795 n. 17, 97 S.Ct. at 2052 n. 17;
 
 see also United States v. Gouveia,
 
 467 U.S. 180, 192, 104 S.Ct. 2292, 2299, 81 L.Ed.2d 146 (1984) (“the Fifth Amendment requires the dismissal of an indictment, even if it is brought within the statute of limitations, if the defendant can prove that the Government’s delay in bringing the indictment was a deliberate device to gain an advantage over him and that it caused him actual prejudice in presenting his defense”).
 

 No circumstances present here warrant a finding that the delay violated petitioner’s due process rights.
 

 First, petitioner has not shown that he was actually prejudiced by the delay to an extent that mandates dismissing the indictment. With regard to Maloney’s testimony that petitioner told him that he stabbed Charles both in the chest and back, there is no evidence that this testimony is inconsistent with the facts, even though the medical evidence reflected that Charles
 
 *999
 
 had been stabbed only in the back. Petitioner may have told Maloney this, believing that he had connected with Charles as Charles tried to get away. Even if it was inconsistent with the facts, it is difficult to see how this prejudiced petitioner. If anything, it made Maloney, the government’s main witness against him, appear less credible. In any case, the fact that witnesses’ memories dim over time is not “the sort of actual substantial prejudice that predicates reversal for pre-indictment delay.”
 
 United States v. Elsbery,
 
 602 F.2d 1054, 1059 (2d Cir.),
 
 cert. denied,
 
 444 U.S. 994, 100 S.Ct. 529, 62 L.Ed.2d 425 (1979).
 

 A similar defect undermines petitioner’s argument regarding the inconsistencies between the testimony of Boyce and Maloney. He argues that these discrepancies indicate that through her testimony, Boyce was attempting to create an alibi for Maloney. On redirect examination of Boyce, the prosecution elicited testimony that indicated that Boyce may have been telling the truth: although she thought the murder occurred the night she first heard petitioner describe it, she was not actually talking about July 10th, when the murder occurred, but rather a night several days later. Again, whatever the jury believed, the discrepancies in their testimony and any evidence that Boyce was attempting to create an alibi for Maloney can hardly have prejudiced petitioner.
 

 Petitioner also suggests that he might have been able to present an alibi defense had the indictment more closely followed the murder of Charles. This alleged prejudice is too speculative to warrant the extreme sanction of dismissal of the indictment. As the Supreme Court stated in
 
 United States v. Marion:
 

 Passage of time ... may impair memories, cause evidence to be lost, deprive the defendant of witnesses, and otherwise interfere with his ability to defend himself_ Possible prejudice is inherent in any delay, however short; it may also weaken the Government’s case.... The law has provided other mechanisms to guard against possible as distinguished from actual prejudice resulting from the passage of time between crime and arrest or charge ... “the applicable statute of limitations ... is the primary guarantee against bringing overly stale criminal charges.”
 

 Id.,
 
 404 U.S. at 321-22, 92 S.Ct. at 464 (quoting
 
 United States v. Ewell,
 
 383 U.S. 116, 122, 86 S.Ct. 773, 777, 15 L.Ed.2d 627 (1966)).
 

 Second, even if the defendant had shown actual prejudice, there is no evidence here of fundamental unfairness or governmental misconduct that violates a sense of fair play and common decency. There is no evidence that the police made a strategic or intentional decision not to pursue leads in order to put petitioner at a tactical disadvantage or otherwise acted with bad intent. At worst, Detective Richardson was careless in not pursuing the lead as diligently as he might have. His explanation that such rumors in his experience are both common and generally unfounded is credible. (Singer Hr., Richardson Testimony at 40) Accordingly, I cannot find the conduct here violated petitioner’s due process rights.
 
 See United States v. King,
 
 560 F.2d 122, 129 (2d Cir.),
 
 cert. denied,
 
 434 U.S. 925, 98 S.Ct. 404, 54 L.Ed.2d 283 (1977) (“Appellants’ contention is that, as early as 1971-72, the Securities and Exchange Commission had enough facts to warrant a further investigation and a speedier indictment_but the S.E.C. cannot be faulted, in view of the limitations on its budget and staff, for concentrating on those other aspects, especially since the Arctic information available to it, though suggestive, was by no means conclusive”).
 

 III.
 

 Petitioner next raises a series of objections to evidentiary rulings by the state trial judge. Specifically, he alleges that the prosecution (1) elicited hearsay testimony that petitioner had been a suspect in the crime in 1972; (2) improperly bolstered witnesses’ credibility during direct examination by eliciting testimony about Maloney’s cooperation with federal authorities and placement in the witness protection program, as well as about attempts on Malo-
 
 *1000
 
 ney’s life that Maloney attributed to petitioner and which caused him to seek federal protection; and (3) elicited testimony about the uncharged assault on the black van driver, which tended improperly to show petitioner’s criminal and violent disposition.
 

 Respondent first contends that some of these claims must be dismissed because petitioner did not argue in state court the federal constitutional bases for his challenges to these evidentiary rulings.
 

 A state prisoner seeking federal ha-beas review of his conviction ordinarily must first have given the state courts a fair opportunity to pass upon his federal claims.
 
 Picard v. Connor,
 
 404 U.S. 270, 275, 92 S.Ct. 509, 512, 30 L.Ed.2d 438 (1971). The exhaustion requirement is not satisfied unless petitioner has informed the state court of both the factual and legal premises of the federal claim he asserts in federal court.
 
 Daye v. Atty. Gen. of New York,
 
 696 F.2d 186, 191 (2d Cir.1982). To inform the state court adequately of his legal claim, “the nature or presentation of the claim must have been likely to alert the court to the claim’s federal nature.”
 
 Id.
 
 at 192. The court will have adequate notice if petitioner relied on federal constitutional precedents, or on cases that relied on those precedents.
 
 Id.
 
 Respondent’s brief in opposition may adequately inform the court that federal claims are in issue.
 
 Id.,
 
 n. 5. “The more specific the description of the right in
 
 question—e.g.,
 
 assistance of counsel, double jeopardy, self-incrimination— the more easily alerted a court will be to consider a constitutional constraint couched in similarly specific terms.”
 
 Id.
 
 at 193.
 

 The Second Circuit in
 
 Daye
 
 considered the effect of a broad assertion that petitioner was denied the right to “a fair trial,” which is in effect what petitioner contends here. The Court held that because this allegation comprises so many potential constitutional claims, to determine whether this constitutes a constitutional claim, a court must look to the factual allegations supporting the claim: “Some will be of patently constitutional dimension. If the defendant claimed that he was accused of one crime but convicted of an entirely different crime and hence was denied a fair trial, no reasonable jurist would doubt that the defendant’s claim implicated his constitutional right to due process of law. In contrast, a defendant’s claim that he was deprived of a fair trial because of the admission in evidence of a statement objectionable as hearsay would not put the court on notice that the defendant claimed a violation of his constitutional right to be confronted by his accusers.”
 
 Id.
 

 Petitioner’s brief on appeal from his conviction shows that as to Detective Richardson’s statement that petitioner’s name had surfaced as a potential suspect in 1972, petitioner claimed on appeal that the improper admission of this testimony “violated both the rule forbidding hearsay and the defendant’s state and federal Constitutional right to cross-examine the witnesses against him.” (Petitioner’s Brief on Appeal, p. 30) According to petitioner, Richardson merely served as a conduit for the unnamed informant’s information. Because the “flimsy” basis for Richardson’s statement was not disclosed to the jury, they did not have the opportunity to discount the statement. Also, they were never instructed as to how properly to consider the testimony. (Petitioner’s Brief on Appeal, p. 32) This claim was therefore clearly presented to the state appellate courts.
 

 Petitioner’s brief on appeal also discussed the alleged improper bolstering of the prosecution’s witnesses prior to cross-examination. In this portion of his brief, petitioner makes no mention of a federal claim, relying instead on New York’s evidentiary rules in support of his claim of reversible error. Respondent’s brief on appeal similarly made no mention of a federal constitutional claim.
 

 With regard to the testimony about his alleged uncharged assault on the van driver, in his brief on appeal petitioner argued that this evidence was improperly admitted to show criminal disposition, or in the alternative was more prejudicial than probative: “It permitted the prosecutor to paint a picture of Schurman as a violent bigoted individual who would pull a knife on slight
 
 *1001
 
 provocation.” (Petitioner’s Brief on Appeal, p. 27) The only reference to a constitutional claim is the following: “Even if the error be deemed non-constitutional, a new trial is still mandated.” (Petitioner’s Brief on Appeal, p. 28) Petitioner’s argument did not specify whether he was discussing the state or federal constitution. Nor does this evidentiary rule call to mind a specific constitutional basis, such as the Confrontation Clause, which would cause the state courts to realize that petitioner was making a federal constitutional claim. Nor did respondent’s brief on appeal discuss a constitutional claim. Petitioner’s reply brief submitted to this court cites one case,
 
 People v. Fiore,
 
 34 N.Y.2d 81, 356 N.Y.S.2d 38, 312 N.E.2d 174 (1974), as a state case which relies on federal constitutional principles discussed in his appellate briefs. This case only proves respondent’s point. Not only does the Court of Appeals hold that the evidentiary rule petitioner argues was violated “rests on grounds of policy in the criminal law,”
 
 id.,
 
 34 N.Y.2d at 85, 356 N.Y.S.2d at 43, 312 N.E.2d at 177, but also the Supreme Court case mentioned by petitioner in his reply brief is cited by the Court of Appeals in support of a wholly different point.
 
 Id.,
 
 34 N.Y.2d at 87, 356 N.Y.S.2d at 44, 312 N.E.2d at 178.
 

 State evidentiary rules do not necessarily provide a basis for a constitutional challenge. Therefore, only the first eviden-tiary claim, involving the hearsay testimony of Detective Richardson, is unquestionably exhausted. The second and third claims are just as clearly unexhausted, and therefore may not be considered absent circumstances not present here.
 

 “[Ejrroneous evidentiary rulings do not automatically rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus. Rather, the writ would issue
 
 only
 
 where [the] petitioner can show that the error deprived [him] of a
 
 fundamentally fair
 
 trial.”
 
 Rosario v. Kuhlman,
 
 839 F.2d 918, 925 (2d Cir.1988) (quoting
 
 Taylor v. Curry,
 
 708 F.2d 886, 891 (2d Cir.),
 
 cert. denied,
 
 464 U.S. 1000, 104 S.Ct. 503, 78 L.Ed.2d 694 (1983)) (emphasis in original). Put another way, to determine whether a constitutional violation has occurred through the erroneous admission of evidence, the petitioner must show that “the erroneously admitted evidence, viewed objectively in light of the entire record before the jury, was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it. In short it must have been ‘crucial, critical, highly significant.’ ”
 
 Collins v. Scully,
 
 755 F.2d 16, 19 (2d Cir.1985) (quoting
 
 Nettles v. Wainwright,
 
 677 F.2d 410, 414-15 (5th Cir.1982)). Petitioner has not met this standard.
 

 Petitioner argues that Richardson’s statement that he was a potential suspect as early as 1972 was inadmissible hearsay. Respondent contends that the statement was elicited to rebut defense counsel’s opening statement that “the evidence will show that there were suspects other than [petitioner] at the time [the police began investigating Charles’ homicide].” The State apparently feared that this statement created the false impression that petitioner was picked out of the blue as a suspect in 1984. Petitioner argues that the hearsay was the statement by the informer passed on to Detective Richardson through FBI Special Agent Corrigan: the rumor on the street was that a person named Frank Schurman stabbed Charles. Yet the statement made by Richardson and objected to by petitioner is quite different. Richardson stated that petitioner was a suspect in 1972. This statement was not offered for the purpose of showing that the rumor passed on by the informant was true. It shows merely that petitioner was suspected, which is information within the first-hand knowledge of Richardson, who led the 1972 investigation. Richardson’s statement is therefore not hearsay, and admission of it, whether erroneous or not, did not violate the Confrontation Clause.
 

 IV.
 

 Finally, petitioner contends that the prosecution improperly inflamed the jury in its opening and summation, in an effort to overcome what petitioner characterizes as
 
 *1002
 
 an otherwise weak case, by suggesting that he had a racial motivation for killing Charles. In so doing, he argues, the State deprived him of his right to a fair trial.
 

 Argument regarding racial motivation is proper so long as it is based on the evidence and never “shifts its emphasis from evidence to emotion.”
 
 United States v. Doe,
 
 903 F.2d 16, 25 (D.C.Cir.1990). In addition, the New York Court of Appeals has held that evidence of racial hostility is admissible when it tends to prove a motive for the crime charged.
 
 People v. Moore,
 
 42 N.Y.2d 421, 429, 397 N.Y.S.2d 975, 366 N.E.2d 1330,
 
 cert. denied sub nom. Moore v. New York,
 
 434 U.S. 987, 98 S.Ct. 617, 54 L.Ed.2d 482 (1977). Motive was an important issue in petitioner’s trial, given his otherwise senseless murder of Charles, and racial motivation was a logical conclusion based on the trial testimony, including petitioner’s statement to Maloney: “Nobody’s going to worry about that nigger, so I killed him, so what?” (Tr. at 182) Also, petitioner could not have been prejudiced by the attribution of a racial motive by the prosecution in light of the more damning evidence of racial epithets throughout petitioner’s admissions to Maloney, Boyce and Cordice. Therefore, even if error was committed, it was harmless beyond a reasonable doubt. Further, the trial judge instructed the jury that they were the sole and exclusive judges of the facts and were not bound by the arguments of counsel.
 

 Even assuming the prosecution’s statements were improper, “it ‘is not enough that the prosecutors’ remarks were undesirable or even universally condemned.’ ... The relevant question is whether the prosecutors’ comments ‘so infected the trial with unfairness as to make the resulting conviction a denial of due process.’ ... Moreover, the appropriate standard of review for such a claim on writ of habeas corpus is ‘the narrow one of due process, and not the broad exercise of supervisory power.’ ”
 
 Darden v. Wainwright,
 
 477 U.S. 168, 181, 106 S.Ct. 2464, 2471, 91 L.Ed.2d 144 (1986) (citations omitted). Moreover, even if the prosecution improperly inferred a racial motivation for the killing from the admissions introduced into evidence, which on these facts is unlikely, the effect of its statements on the jury’s impression of petitioner was marginal, particularly in light of the trial court’s instructions to the jury.
 
 Garofolo v. Coomb,
 
 804 F.2d 201, 206 (2d Cir.1986).
 

 This case is fundamentally different from those cases, cited by petitioner, in which the prosecution appeals in summation to the racial prejudices of jurors.
 
 See McFarland v. Smith,
 
 611 F.2d 414 (2d Cir.1979);
 
 United States v. Weiss,
 
 930 F.2d 185 (2d Cir.1991). No appeal was made in this case to racial prejudice or other improper motivation. Instead, racial prejudice was attributed to petitioner by way of explaining the murder. This conclusion was fairly drawn from the evidence of racial prejudice in statements petitioner allegedly made to Boyce, Maloney and Cordice. The jurors were free to regard or disregard it, in accordance with the trial court’s instruction to them that they were the sole and exclusive finders of fact.
 

 * * * * * *
 

 For the reasons discussed above, the writ is denied and the petition is dismissed.
 

 SO ORDERED.
 

 [1]
 

 . Richardson recalled that Corrigan told him only that the "rumor on the street” was that a Frank Schurman had stabbed Charles. (Singer Hr., Richardson Testimony at 11)
 

 [2]
 

 . Cordice testified that his friend was driving. (Tr. at 275-76)