STATE of Missouri, Respondent,

v.

John Joseph COUTEE, Appellant.

John Joseph COUTEE, Movant/Appellant,

v.

STATE of Missouri, Respondent.

Nos. 18366, 19088.

Missouri Court of Appeals,
Southern District,
Division One.

July 12, 1994.

Gary E. Brotherton, Office of the State Public Defender, Columbia, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Traci J. Sanders, Asst. Atty. Gen., Jefferson City, for respondent.

MONTGOMERY, Judge.

A jury convicted John Joseph Coutee (Defendant) of second degree murder and armed criminal action. He appeals, raising the following points: (1) the trial court should have *sua sponte* declared a mistrial when the prosecutor referred to Defendant as a racist; (2) the court should have excluded certain trial testimony, which Defendant claims was meant solely to portray him as a racist; and (3) the court should have declared a mistrial when the State failed to disclose a potentially exculpatory police report until the third day of trial.

Viewed in the light most favorable to the verdict, the facts are as follows: At approximately 2 a.m. on July 23, 1991, two black men, Maurice Baker and Doug King, were outside a house on Clay Street in Springfield, Missouri. Several others were also there. King overheard one of those present say that "someone was coming back," and all of a sudden he heard popping noises. Immediately, everyone started running—everyone except Baker. He had been fatally injured by a bullet wound to the head.

Defendant lived not far from where Baker was shot. Two days before the shooting, Defendant had complained to police that someone smashed some windows in his auto-

mobile. He threatened to shoot whoever was responsible if they came back.

Adjacent to Defendant's residence lived Christine Bailey, who described her relationship with Defendant as "very unnerving." Not only had Defendant refused to let his daughter play with Bailey's two children because they were of mixed race, but he had also intimidated Bailey and her friends, in particular her black friends. In the days immediately before the shooting, Bailey became especially alarmed. Defendant and his family members had entered Bailey's yard, threatened her, and attempted to pull her from her house. As a result, Bailey purchased a .22 caliber semi-automatic rifle and two boxes of .22 caliber shells.

On the evening of July 22, 1991, while Bailey was outside her house cleaning the newly purchased gun, Defendant and a companion, David Griffith, came to her yard. Defendant asked to see Bailey's gun. After inspecting it, he and Griffith left. Later that same evening, about midnight, Bailey was once again in her yard. Defendant and Griffith approached her, and she noticed that each man carried a beer in one hand and a firearm in the other. As Bailey stood near the fence holding her rifle, Defendant said that a group of people was "coming up the alley." He then made a quick movement and took Bailey's rifle from her. As he did so, he threw his own gun in Bailey's arms and "took off down the alley." The rifle he took from Bailey was loaded with 13 shells.

Bailey tried to follow, but when she reached the alley, she saw no one and heard nothing to indicate that people were coming up the alley. A short time later, she walked to a nearby convenience store. On the way, she walked the same alley down which Defendant had fled. Again, she saw neither Defendant nor Griffith.

While at the store, Bailey witnessed a young black male run in and say that someone had been shot. Concerned about her children's safety, Bailey returned home. About five minutes after her arrival, Defendant and Griffith entered her house without permission. Upon entering, Defendant said, "All this is going to be over with, I've taken care of it tonight. I shot me three or four niggers, I shot three or four niggers, three or four of them went down."

Bailey then asked for her rifle back. Upon inspection, she noticed that it was "soaking wet," the barrel was warm, and all the shells were gone. When Bailey asked why the rifle was wet, Defendant said that he "wanted to get the stuff off of it." He also said he was going to have the gun "bored out." He and Griffith then left. Less than an hour later, however, Defendant returned and, pointing a weapon at Bailey, demanded her rifle. Having broken down the rifle to clean it, Bailey gave Defendant only the barrel, which Defendant said he intended to bore out.

Eventually, Bailey told law enforcement officials about these events and gave them those parts of her rifle still in her possession. In the meantime, an investigation at the shooting site uncovered 13 empty shell cases. Subsequently, Defendant was arrested.

While incarcerated, Defendant told a cell mate that he was in jail for shooting a "nigger." He said the person he shot had broken out several windows in houses and cars belonging to white people in his neighborhood. According to the cell mate, he also said he "wished he hadn't got the girl involved, that he wouldn't be—that he wouldn't have got caught, that if he hadn't done it he wouldn't have got caught."

At trial, Defendant testified that David Griffith was responsible for the shooting. He also testified that it was Griffith's idea to put Bailey's gun in water "to cover up fingerprints or something." He acknowledged on cross-examination, however, that he had lied to investigating officers about his activities on the night of the shooting, and he admitted that in his earlier stories he had never accused Griffith of being responsible for the shooting.

Following conviction, Defendant was sentenced to two consecutive prison terms, one for life and one for 30 years. He subsequently filed notice of appeal from his conviction and a pro se motion for postconviction relief. The motion court denied Defendant's request for postconviction relief without an evidentiary hearing. Defendant then filed a notice of appeal from the motion court's rul-

ing. However, because Defendant's brief on appeal raises no issues regarding his motion for post-conviction relief, we consider that appeal to be abandoned. *State v. Barnard*, 820 S.W.2d 674, 677 (Mo.App.1991).

## I.

In his first point, Defendant contends that the trial court erred in failing to *sua sponte* declare a mistrial when, during opening argument,[1] the prosecutor referred to him as a racist. Specifically, he protests the prosecutor's statements that Defendant "doesn't like black people," that he is a racist, and that he shot 13 rounds into a group of black people because they "were nameless, faceless people to him." He also complains about the prosecutor pointing out that Defendant referred to African Americans as "niggers."

Defendant concedes that he raises this issue for the first time on appeal. No objections were made at trial, and no claim of error was raised in Defendant's new trial motion. Thus, nothing is preserved for review. *State v. Herrick*, 814 S.W.2d 660, 664 (Mo.App.1991). Nonetheless, Defendant urges us to consider this issue under the plain error standard of Rule 30.20.[2] We do so *ex gratia.*

■ Relief under the plain error standard is granted "only when the alleged error so substantially affects the rights of the accused that a manifest injustice or miscarriage of justice inexorably results if left uncorrected." *State v. Hadley*, 815 S.W.2d 422, 423 (Mo. banc 1991). As this Court pointed out in *State v. Bogard*, 836 S.W.2d 87, 89 (Mo. App.1992), we rarely grant relief on assertions of plain error regarding closing arguments because, absent objection and request

for relief, the trial court's options are narrowed to uninvited interference with summation and a corresponding increase of error by such intervention. Alleged errors by a prosecutor in closing argument justify relief under plain error only if they are determined to have had a decisive effect on the jury. *State v. Sidebottom*, 753 S.W.2d 915, 920 (Mo. banc 1988), *cert. denied*, 488 U.S. 975, 109 S.Ct. 515, 102 L.Ed.2d 550 (1988).

■ The trial court is in the best position to assess the prejudicial effect of a prosecutor's statements. *State v. Vitale*, 801 S.W.2d 451, 457 (Mo.App.1990). Trial counsel are to be given wide latitude in making summations and may make reasonable inferences from the evidence during argument. *State v. Martin*, 852 S.W.2d 844, 853 (Mo. App.1992). Trial counsel may state opinions or conclusions that are fairly drawn from the evidence and may draw any inference from the evidence that counsel believes in good faith to be justified. *Id.* "Epithets about a defendant made during closing argument are unnecessary and can rise to prejudicial error if sufficient to inflame the jury." *State v. Grissom*, 804 S.W.2d 777, 780 (Mo.App.1990). However, "[w]here the characterization of the defendant is based upon the evidence received at trial, such prejudice does not result." *Id.*

■ The evidence adduced in this case clearly justifies the prosecutor's inference— and statements—that Defendant was a racist. Moreover, these statements were no more egregious than those complained of in numerous comparable cases in which reviewing courts have refused to find prejudicial error.[3]

---

1. Although Defendant's point relied on complains of statements made during opening argument, the statements about which Defendant complains actually occurred during the opening portion of the State's closing argument. This being the situation, cases involving prosecution comments during closing argument are relevant to our decision.

2. Rule references are to Missouri Rules of Court (1994). In pertinent part, Rule 30.20 states that "plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom."

3. *See, e.g., State v. Smith*, 781 S.W.2d 761, 771 (Mo. banc 1989), *vacated on other grounds*, 495 U.S. 916, 110 S.Ct. 1944, 109 L.Ed.2d 306 (1990) (defendant referred to as "just a killing machine" on a "killing spree"); *State v. Wood*, 719 S.W.2d 756, 759 (Mo. banc 1986) (defendant called an "animal"); *State v. Jackson*, 499 S.W.2d 467, 471 (Mo.1973) (defendant labeled a "no-good murderer"); *State v. White*, 733 S.W.2d 57, 61 (Mo. App.1987) (defendant referred to as "a predator," "a bug" and "a person preying on the poor"); and *State v. Mayfield*, 562 S.W.2d 404, 412 (Mo.App.1978) (defendant called a "monster" and a "base animal").

Not only was there ample evidence to justify the prosecutor's statements, but there was also ample evidence to justify the jury's conclusion that Defendant was guilty of the crimes charged. We conclude that these statements did not have a decisive effect on the jury's decision. Point I is denied.

## II.

In Defendant's second point, he contends that the trial court erred in overruling his objections at trial to the introduction of allegedly irrelevant testimony by Christine Bailey. The sole purpose of that testimony, he argues, was to portray him as a racist.

In particular, Defendant challenges Bailey's testimony that (1) her relationship with Defendant was tense, (2) Defendant refused to let his daughter play with Bailey's children because they were of "mixed race," and (3) Defendant repeatedly threatened Bailey and her black friends. Defendant argues that Bailey's testimony constituted unnecessary evidence of prior misconduct and that the only purpose and effect of this evidence was to "fan the flames of prejudice against appellant and his alleged beliefs." The State argues that Bailey's testimony was relevant to establish motive and intent and to provide the jury with a complete story of the events surrounding the death of Maurice Baker. We agree with the State's position.

"The general rule concerning the admission of evidence of uncharged crimes, wrongs, or acts is that evidence of prior uncharged misconduct is inadmissible for the purpose of showing the propensity of the defendant to commit such crimes." *State v. Bernard*, 849 S.W.2d 10, 13 (Mo. banc 1993).

As Defendant correctly points out, Missouri courts have used this rule to exclude not only evidence of uncharged crimes but also evidence of noncriminal acts. *See State v. Kitson*, 817 S.W.2d 594, 597–98 (Mo. App.1991) (evidence of defendant's unusual sexual activities with wife excluded from trial on sodomy charges). As explained in a recent opinion from our supreme court, the rule covers "any wrongdoing that could have been the subject of a criminal charge and probably covers other wrongful acts and conduct to the extent that it conveys to the jury the type of prejudice that accompanies a disclosure that the defendant has engaged in criminal conduct." *State v. Sladek*, 835 S.W.2d 308, 313 n. 1 (Mo. banc 1992) (Thomas, J., concurring).

There are exceptions to this general rule, however. These exceptions allow the admission of evidence of uncharged misconduct that "tends to establish motive, intent, the absence of mistake or accident, or a common plan or scheme." *State v. Harris*, 870 S.W.2d 798, 810 (Mo. banc 1994). In addition, the so-called "complete story" or *res gestae* exception provides for the admission of evidence necessary to provide a complete and coherent picture of the crime charged, the events leading up to it, or the circumstances surrounding it. *See State v. Flenoid*, 838 S.W.2d 462, 467 (Mo.App.1992); *State v. Tomlin*, 830 S.W.2d 31, 34 (Mo.App. 1992); and *State v. Pelz*, 831 S.W.2d 635, 636–37 (Mo.App.1992).

Two limitations on evidence introduced under any of these exceptions are that the evidence must be logically relevant (i.e., it must tend to establish guilt for the crime charged) and it must be legally relevant (i.e., its probative value must outweigh its prejudicial effect). *Bernard*, 849 S.W.2d at 13. Balancing the potential value and prejudicial effect of evidence rests within the sound discretion of the trial court, which is in the best position to make such a determination. *Id.; State v. Henderson*, 826 S.W.2d 371, 374 (Mo.App.1992).

Neither party has cited any Missouri cases that deal precisely with the question of whether evidence of a defendant's racist acts or attitude can be introduced to show motive or intent to commit the crime charged or to provide a complete story of the surrounding circumstances. In numerous cases from other jurisdictions, however, courts have approved the introduction of evidence regarding a defendant's racial hostility to establish a motive for the crime charged.[4] We do the same in this case.

---

**4.** *See, e.g., United States v. McInnis,* 976 F.2d 1226, 1231–32 (9th Cir.1992) (defendant's pos-

We assume, *arguendo,* that testimony regarding Defendant's racism was capable of "convey[ing] to the jury the type of prejudice that accompanies a disclosure that the defendant has engaged in criminal conduct." *Sladek,* 835 S.W.2d at 313 n. 1. We nevertheless decline to convict the trial court of error for allowing the jury to hear that testimony. Evidence that Defendant refused to allow his daughter to play with Bailey's children because they were of "mixed race" and that he threatened some of Bailey's friends simply because they were black was clearly relevant to establish Defendant's motive for firing 13 shots into a crowd of unknown black people.

■ Even Bailey's more general statements that her relationship with Defendant was tense and that she felt threatened by him were relevant to the issue of Defendant's motive. The primary basis for Bailey's feelings appear to have been Defendant's racial attitudes. In addition, the evidence of Defendant's interactions with Bailey falls within the *res gestae* exception. It helps explain where the murder weapon came from, why Bailey had that weapon in the first place, how Defendant got it from her, and why she waited to contact the police until after she had moved her children and made sure they were safe. ·The State may paint a complete picture of the crime charged and need not sift and separate evidence. *Henderson,* 826 S.W.2d at 374.

The trial court did not err in allowing the State to introduce the evidence of which Defendant complains. Point II is denied.

### III.

In Defendant's final point, he argues that the trial court erred in overruling his request for a mistrial when the State failed to disclose a potentially exculpatory police report until the third day of trial. We reject this point on several grounds.

The police report Defendant refers to was prepared by Robert Greer, one of the officers who investigated at the scene of Maurice Baker's death. Through inadvertence, neither defense counsel nor the prosecutor received this report until the morning of the third day of trial, shortly before Defendant called Officer Greer to testify. Included in that report was a notation that, at the scene of the shooting, two anonymous individuals told Greer that they thought they knew who shot Baker and that they had several times seen the people responsible for the shooting near the Heatherwood Apartments on Washington Street. Apparently, Greer decided not to investigate these statements, but since the record before us does not include a copy of Greer's report, we are unaware of the reasons for his decision.

At trial, defense counsel argued that, because Defendant did not live in the Heatherwood Apartments, these statements pointed toward potentially exculpatory evidence that should have been investigated. Further, he argued, because he had had no opportunity to investigate the information prior to trial, the court should grant an immediate mistrial. In opposition, the prosecutor argued that (1) the two people mentioned in Greer's report said they would not testify at trial, (2) their statements were very vague and general, and (3) they did not say that the people responsible for the shooting *lived* at the Heatherwood Apartments, merely that they frequented those apartments. In addition, the prosecutor pointed out that during a previous trial on these same charges, Defendant testified that he actually witnessed the shooting and that his companion, David Griffith, was the one who shot Baker.[5]

session of swastikas admissible to prove that racial hatred motivated him to forcefully interfere with exercise of housing rights by black families); *Schurman v. Leonardo,* 768 F.Supp. 993, 1002 (S.D.N.Y.1991) ("evidence of racial hostility is admissible when it tends to prove a motive for the crime charged"); *Kight v. State,* 512 So.2d 922, 927–28 (Fla.1987), *cert. denied,* 485 U.S. 929, 108 S.Ct. 1100, 99 L.Ed.2d 262 (1988) (defendant's racist remarks during un-

charged crime evidenced racial motive for charged crime).

5. This case was originally tried before a jury in January 1992. The trial court declared a mistrial when the jury was unable to reach a verdict after five hours of deliberation. In a second trial, during April 1992, a mistrial was declared during voir dire.

The trial court overruled defense counsel's motion for a mistrial. On appeal, Defendant argues that the trial court erred in overruling this motion. We disagree.

"The purpose of the discovery rules is to enable a defendant to adequately prepare his defense to ensure him a fundamentally fair trial." *State v. Lamphier*, 745 S.W.2d 166, 169 (Mo.App.1987). When the State fails to make timely disclosure, the appropriate sanctions are left to the sound discretion of the trial court. *State v. Skinner*, 734 S.W.2d 877, 885–86 (Mo.App.1987). Appellate courts intervene only where a defendant demonstrates that the State's failure to make a timely disclosure resulted in fundamental unfairness. *Id.*

One appropriate remedy a trial court may utilize is granting a defendant a continuance when the State fails to make timely disclosure. *State v. Turner–Bey*, 812 S.W.2d 799, 807 (Mo.App.1991). Here, however, Defendant requested no continuance. He only requested a mistrial, to the exclusion of other remedies available to him. Yet, a mistrial is a drastic remedy that should be employed only where there is grievous error that cannot otherwise be remedied. *State v. Vineyard*, 839 S.W.2d 686, 691 (Mo.App. 1992). Under these circumstances, Defendant has failed to demonstrate that the State's untimely disclosure resulted in any fundamental unfairness to him.

This is especially apparent when we consider that defense counsel knew the identity of the officer who made the report well in advance of trial and was specifically informed about the report prior to the close of the State's case. Defendant claims that the information in the report might have provided another theory of defense had it been disclosed earlier. If this is true, however, a continuance would have provided the opportunity to investigate that information and present such an alternative theory. Instead, Defendant requested only a mistrial and then proceeded to testify as he had during his first trial, stating that he saw Griffith shoot Baker.

Ironically, Defendant also called Officer Greer as a defense witness. We therefore view with some suspicion defense counsel's claim of surprise regarding the contents of Greer's report. In fact, while Greer was on the stand, defense counsel attempted to elicit from him testimony about the statements made by the two anonymous individuals. That testimony was cut short when the State made a hearsay objection, which the trial court later sustained. Nevertheless, the transcript of the ensuing bench conference shows that defense counsel had followed common practice and talked with Greer prior to calling him to testify. More significantly, the transcript clearly shows that defense counsel had discussed with Greer the statements made by the two anonymous individuals.

Even more telling, when the issue of Greer's report was raised in Defendant's motion for new trial, no affidavit or other additional information was included to support the claim of error. Apparently, between the date of Defendant's conviction and the filing of the new trial motion, defense counsel discovered nothing of relevance regarding the "exculpatory information" contained in Greer's report. Once more, we fail to see how the State's untimely disclosure of the report resulted in any fundamental unfairness.

Defendant claims, however, that his constitutional rights were violated by the late disclosure of Greer's report and that only a mistrial would have been an adequate remedy. In support of this contention he cites *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), in which the Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87, 83 S.Ct. at 1196–97.

Like the court did in *State v. Wolfe*, 793 S.W.2d 580, 588 (Mo.App.1990), we observe that "it is not clear this case is controlled by *Brady*." In *Wolfe*, as here, the allegedly exculpatory evidence at issue was revealed *during* trial rather than after. That being the case, the *Wolfe* court stated:

The Supreme Court held in *Brady* that prosecutorial suppression of material, exculpatory evidence violates due process. Here, however, the alleged exculpatory evidence was revealed during trial. Thus, the analysis from *Brady,* involving the effect of nondisclosure of evidence until after trial, may not be applicable.

*Id.* (citations omitted).

■ Even if we assume that *Brady* is applicable, a constitutional error occurs only if the suppression of evidence materially undermines confidence in the outcome of the trial. *United States v. Bagley,* 473 U.S. 667, 682, 105 S.Ct. 3375, 3383, 87 L.Ed.2d 481 (1985). Stated another way, "evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Id.* We find no such probability here. Point III is therefore denied.

The judgment of conviction is affirmed. The appeal from the denial of the postconviction motion is dismissed.

PARRISH, C.J., and SHRUM, J., concur.