[908 NYS2d 194]

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v CLARENCE WILLIAMS, Also Known as FLETCHER ANDERSON WORRELL, Appellant.

First Department, October 7, 2010

## APPEARANCES OF COUNSEL

*Steven Banks, The Legal Aid Society*, New York City (*Martin M. Lucente* of counsel), for appellant.

*Cyrus R. Vance, Jr., District Attorney*, New York City (*Vincent Rivellese* of counsel), for respondent.

## OPINION OF THE COURT

NARDELLI, J.

The genesis of this proceeding is a notorious incident involving a brutal rape and robbery in 1973 in Manhattan. The issues presented are whether defendant's statutory and constitutional rights to a speedy trial were violated, and also whether the trial court should have conducted an inquiry of the jurors to determine whether they had read an article in a prominent newspaper about the trial on the day it commenced.

Defendant has a history of being arrested under different names. For instance, on August 12, 1972, he was arrested for possession of burglar's tools while on a fire escape, and gave his name as Anderson Worrell, with a date of birth of December 30, 1946, and an address of 180 Saratoga Avenue in Kings County. When he was arrested for the rape in this case in June 1973, he told police that his name was Clarence Williams, that he was born on November 10, 1945, and that he lived at 432 East 10th Street. He also claimed that he did not have a criminal history.

On September 25, 1974, while awaiting trial on this case, defendant was arrested in Queens County for an attempted murder and rape that had occurred on July 18, 1974. When arrested in Queens, defendant gave his name as Anderson Worrell, his date of birth as December 30, 1946, and his residence as 1974 Montau or Montauk Street in Kings County, and his prior residence as 326 Riverside Drive in Manhattan. He claimed that he had a wife named Rasheda Worrell who lived in the Bronx.

Defendant was tried in this case as Clarence Williams in November 1974. The jury, however, could not reach a verdict, and a mistrial was declared.

On October 31, 1975 defendant, as Anderson Worrell, was convicted in Queens County of attempted murder and rape, and sentenced to a term of 10 years. On November 18, 1975, he pleaded guilty in this case, with the understanding that he could seek to have his plea vacated if his conviction in Queens were reversed on appeal. Defendant was sentenced to a term of 10 years, which was to run concurrently with the term imposed on the Queens County conviction.

In 1976 the Second Department reversed defendant's conviction in Queens County (*People v Worrell*, 54 AD2d 768 [1976]). On January 14, 1977, his plea in this case was consequently vacated. On January 28, 1977, an individual identified as Rasheeda Abdul Hakeem posted cash bail for defendant, and gave a Washington, D.C. post office box as her address.

During 1977, this case was adjourned about a dozen times, with at least nine adjournments marked "ex," meaning either that the time was excludable or that defendant was excused, since during that period, defendant's attorney was preparing, and the court was considering, his suppression motion, which had been made on August 10, 1977.

On September 25, 1977, defendant was arrested in Washington, D.C., and gave his name as Hakim Abdul Umar. While this arrest now appears on defendant's consolidated NYSID report, the New York County prosecutor handling the case at that time was unaware that defendant was in Washington, D.C., and the People's file contained no information on defendant's whereabouts.

On October 5, 1977, defendant failed to appear in the Queens County case. A warrant was issued for his arrest, and bail was forfeited. After several adjournments of this case in New York County, defendant's bail was forfeited on February 15, 1978,

and a bench warrant was issued. Defendant then vanished, insofar as the New York court system was concerned, for 26 years.

He was eventually returned to New York in 2004 on the 1978 New York County warrant. In his motion in New York County in which he claimed that his right to a speedy trial had been impaired, defendant submitted an affirmation from Michael Keesee, his attorney in the Queens County prosecution, which had been submitted in support of a motion in Queens County in which defendant sought to vacate the Queens bail forfeiture. Keesee stated that after defendant's arrest in Washington, D.C., in 1977, he had been found unfit to proceed and was committed to St. Elizabeth's Hospital on March 9, 1978. On October 10, 1978, the court in Queens County denied the motion, finding insufficient evidence that defendant's "alleged incarceration in Washington, D.C." had prevented his appearance in Queens, and further noting that even if it were to find the affirmation and order of commitment credible, they only established defendant's whereabouts on the March 1978 committal date, and failed to explain why he did not appear in Queens in 1977.

In his speedy trial motion in this case, defendant himself offered an affidavit, which he signed "Fletcher Anderson Worrell," in which he asserted that he had been involuntarily committed at St. Elizabeth's Hospital in Washington, D.C., from 1978 until 1981, although hospital records offered by the People in opposition to the motion established that no individual by the name of Fletcher Anderson Worrell had been treated at the hospital during that period. DNA evidence offered by the People established that defendant had committed nine rapes in Maryland between 1987 and 1991, and two more in New Jersey in 1993.

Other evidence established that on August 19, 1993, defendant had been issued a passport in the name of Fletcher Anderson Worrell. According to defendant, he relocated to Egypt from 1993 until he returned to the United States on August 28, 2003. On September 9, 2003, defendant obtained a birth registration card in the name Fletcher Anderson Worrell, with a birth date of December 30, 1946. A few months later, defendant obtained a Georgia driver's license and a health insurance card using that same name.

In an application to purchase a gun, dated May 21, 2004, defendant provided a different Social Security number than he had given previously, and claimed that he was not under indict-

ment, not a fugitive, and had never been committed to a mental institution. When he provided his fingerprints, however, the New York State Division of Criminal Justice Services determined that defendant had two different prior NYSID numbers. The new consolidated report under a new NYSID number listed his former names as Fletcher Worrell, Anderson Worrell, Umar Abdul Hakeem, Clarance Williams and Clarence Williams; with two different dates of birth, three different Social Security numbers, and two reported places of birth. He was returned to New York on the outstanding New York warrant in October 2004.

Defendant moved to dismiss the indictment on statutory and constitutional speedy grounds. The motion was denied in an order dated October 31, 2005.

The United States Supreme Court has identified four factors in considering whether a defendant has been deprived of his constitutional rights under the Sixth Amendment to a speedy trial: "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant" (*Barker v Wingo*, 407 US 514, 530 [1972]; *see also Doggett v United States*, 505 US 647, 651 [1992]). In New York this inquiry has been interpreted to include five factors:

> "(1) the extent of the delay; (2) the reason for the delay; (3) the nature of the underlying charge; (4) whether or not there has been an extended period of pretrial incarceration; and (5) whether or not there is any indication that the defense has been impaired by reason of the delay" (*People v Taranovich*, 37 NY2d 442, 445 [1975]).

■ Regardless of which test is applied, however, "the Speedy Trial Clause's core concern is impairment of liberty" (*United States v Loud Hawk*, 474 US 302, 312 [1986]). Here, as will be discussed further, it is beyond cavil that the sole reason for the delay in defendant not being tried earlier was his own conduct. He fled, first to another city, and then to another continent, and used multiple aliases and dates of birth. The conflicting pedigree information he provided had its obvious effect—to prevent authorities from realizing that defendant was wanted in New York to face trial. Defendant cannot now claim that he was deprived of his constitutional speedy trial rights since the delay was entirely attributable to his conduct in absconding from the jurisdiction and using aliases (*see People v Brown*, 281 AD2d 340, 341 [2001], *lv denied* 96 NY2d 899 [2001]).

In asserting his statutory speedy trial challenge, defendant first argues that the motion court should have been guided by the 1973 version of CPL 30.30, rather than the 1984 version, and that under the earlier version the time during which he was absent would not be excludable unless his absence prevented the People from being ready for trial.

Criminal Procedure Law § 30.30 requires that the People must be ready for trial within six months of the commencement of a felony action. In its 1973 incarnation, operative at the time that the prosecution of this case was initiated, the People could not be charged with a "period of delay resulting from the absence or unavailability of the defendant" (CPL 30.30 [4] [c]). In *People v Sturgis* (38 NY2d 625 [1976]), the Court of Appeals interpreted that provision to require a showing not just that the defendant had been absent or unavailable, but that the delay in readiness resulted from that absence or unavailability (*id.* at 628). The Legislature amended subdivision (4) (c) to overrule the decision in *Sturgis*, so that the People would not be required to establish a causative relationship "between the defendant's absence or unavailability and the People's delay in preparing their case" (*People v Bolden*, 81 NY2d 146, 151-152 [1993]). Under the amendment, the People need only establish that the defendant is absent, and his whereabouts cannot be obtained by due diligence, in order for the time not to be charged against them.

The People argue that the earlier version of the statute is inapplicable because CPL 30.30 is procedural in nature, and thus a speedy trial motion based on the statute is governed by the law in effect at the time of the motion. They cite *People v Mandel* (48 NY2d 952 [1979]), in which the Court of Appeals upheld application of the amended version of CPL 60.42 (which governs the admissibility of the history of complainant's sexual conduct) in a case where the crime had occurred when a prior, less restrictive law was in effect.

To determine whether defendant was deprived of his statutory right to a speedy trial, however, we need not address the issue of whether CPL 30.30 is a procedural or substantive statute. Even if the earlier version of CPL 30.30 (4) (c) governs our inquiry, the record supports a finding that defendant's absence was responsible for the delay in bringing him to trial. Defendant had previously been tried, and the jury was unable to reach a verdict. While this Court does not have the benefit of the jurors' thinking in ascertaining why they could not reach a

unanimous decision, it is self-evident that in a rape case the victim's testimony, and, in particular, in-court identification of the defendant, are central to any quest for a conviction. Even though the victim had presumably identified defendant at the prior trial, the jury still could not reach a verdict. Clearly, defendant's presence at a second trial, where the victim could identify her assailant to a new group of jurors, would be a sine qua non to a successful prosecution.

Further, at the time he was recaptured, defendant had already been indicted and tried, while the defendant in *Sturgis* had not even been indicted at the time he went missing. The Court of Appeals specifically noted that the failure to indict did not in any way result from the defendant's absence (*Sturgis*, 38 NY2d at 628).

More to the point, in *People v Patterson* (38 NY2d 623 [1976]), decided the same day as *Sturgis*, the Court found that a defendant who had been indicted, but failed to appear on the adjournment date, was not entitled to a dismissal pursuant to CPL 30.30 (4) (c). Even though the defendant was working in a parking lot in close proximity to the county jail, the Court found that his admission that he had been waiting for the authorities to come and arrest him provided a basis for excluding the period of time that his location was unknown, and finding that he was attempting to avoid prosecution (*Patterson*, 38 NY2d at 625).

Parallel reasoning suggests that a defendant who flees the jurisdiction and uses multiple aliases, after indictment and a mistrial, was also attempting to avoid prosecution, and that this conduct hampered the People's ability to bring him to trial (*see People v Delacruz*, 271 AD2d 452 [2000]; *People v Ladson*, 202 AD2d 212 [1994], *affd* 85 NY2d 926 [1995]; *see also People v Cadilla*, 245 AD2d 9 [1997], *lv denied* 91 NY2d 924 [1998]). We also note that in *People v Colon* (59 NY2d 921 [1983], *revg for reasons stated in* 110 Misc 2d 917 [Crim Ct, NY County 1981]), upon which defendant relies, the defendant had been charged with two misdemeanors, but an information had not been prepared. The court found that "the fundamental task of filing sufficient informations" was not impaired in any way by the defendant's absence (110 Misc 2d at 922).

The facts presented here are significantly distinguishable from those in the cases on which defendant relies, and we thus conclude that his absence was the principal factor in the People's inability to advance the criminal proceeding.

Defendant also argues that at the time of the October 3, 1978 Queens bail exoneration motion his location was known. Yet, while the Queens County authorities may have known of defendant's whereabouts at that point in time, nothing in the record establishes that the officials in New York County had actual knowledge of his location. The Court of Appeals has made clear that knowledge of a defendant's location by another authority cannot be imputed to a prosecutor who lacks actual knowledge (*see People v Sigismundi*, 89 NY2d 587, 592 [1997]).

Defendant's remaining argument is that the trial court should have conducted an inquiry of the jurors when, on the morning of the trial's opening statements, the New York Times published a front-page article about the trial, to determine whether any jurors had read the article. According to defendant, the article was highly sympathetic to the victim, and included statements that the DNA evidence had provided a "conclusive" link between defendant and this crime, as well as dozens of rapes and similar crimes along the East Coast.

Defense counsel requested an in camera inquiry of the individual jurors to determine whether they had read the article and, if so, whether the opinions expressed in the article would taint their ability to be fair and impartial. The court denied the application, noting that it had emphasized in each round of the voir dire and at each recess that the jurors must not listen to or read any account of the case in any news media, and concluding that there was no reason for it to question the jurors.

A trial court has wide flexibility to determine "what, if any, steps are required to assure a defendant's right to a fair trial in light of . . . midtrial publicity" (*People v Shulman*, 6 NY3d 1, 32 [2005], *cert denied* 547 US 1043 [2006]; *see People v Erving*, 55 AD3d 419 [2008], *lv denied* 11 NY3d 897 [2008]). Where a newspaper article appears in the middle of trial, the court retains discretion whether to ask the jurors if they have seen the article (*see People v Medina*, 67 AD3d 548, 549-550 [2009]; *Erving*, 55 AD3d at 419). The court may decide not to inquire about an article, which inquiry could have the effect of focusing the jurors' attention on something that there was no indication any of them had seen (*see Shulman*, 6 NY3d at 30-32). Furthermore, where the trial judge admonishes the jurors to avoid press coverage of the case, the defendant is less likely to suffer prejudice from midtrial publicity (*see People v Moore*, 42 NY2d 421, 434 [1977], *cert denied* 434 US 987 [1977]).

Here, as the court noted, the jurors had been repeatedly warned that if the case were reported in the press or on the

radio or television, they were not to listen to or read any account or discussion of the case other than the trial testimony. Defense counsel also discussed press coverage, and asked the jurors to assure him that they could follow the judge's instructions and not read any articles about the case.

Two prospective jurors had read a New York Post article. One informed the court, outside the presence of the other jurors, that he had read a Post article which "has a bearing on this case"; he was ultimately removed by a defense peremptory challenge. After another prospective juror reported that he had also read the Post article the previous evening, counsel asked the court to repeat its instruction, and the court complied, and repeated its admonition that the jurors should not read anything in the paper and should turn off the radio or television if there was any coverage of the case. Defense counsel asked the juror if he could promise not to consider anything he read in the article. The juror agreed, and confirmed that he would decide the case based on the evidence presented; he was seated as a juror.

After the New York Times article appeared, the court delivered its preliminary instructions, which included the admonition not to read or to listen to any media accounts of the case. The court agreed at counsel's request to remind the jurors not to read the newspapers, and accordingly, each day, the court instructed the jury not to read or listen to any account or discussion of the case in the newspaper, or on the radio or television.

■ In view of these repeated cautionary instructions, the court did not abuse its discretion in declining to conduct an individual inquiry of each juror. While the placement of the article on the first page heightened the possibility that a juror might see it, and defendant argues that it is "virtually unthinkable" that none of the jurors would have seen the article, the record does not reveal any reason to believe that any juror had actually seen or read the article. For instance, during the voir dire, two jurors had informed the court that they had seen an article in the Post, yet during the trial, no jurors came forward to inform the court that they had seen or read the Times article.

Defendant further argues that the admission by two prospective jurors that they had read the Post article demonstrates that the court's instructions were ineffective in preventing the jurors from reading such news articles. The court, however, noted that while it had on the first day instructed the sworn jurors not to read any articles, it may not have given that instruction to all of the prospective jurors, which would explain why those two

jurors had read the Post article. Furthermore, the fact that the second juror had read the article, yet the defense did not use a peremptory challenge to excuse him, suggests that counsel believed that the court's instructions would be sufficient to insure that the jurors—even a juror who had read an article about the case—would decide the case in accordance with the court's instructions to base the verdict solely on the evidence presented at trial.

Accordingly, the judgment of the Supreme Court, New York County (Renee A. White, J., at speedy trial motion; Bonnie G. Wittner, J., at trial and sentence), rendered November 28, 2005, as amended November 30, 2005, convicting defendant of rape in the first degree and robbery in the first degree, and sentencing him to consecutive terms of 8⅓ to 25 years and 7 to 21 years, should be affirmed.

SAXE, J.P., FRIEDMAN, FREEDMAN and ABDUS-SALAAM, JJ., concur.

Judgment, Supreme Court, New York County, rendered November 28, 2005, as amended November 30, 2005, affirmed.