People v Carter (2018 NY Slip Op 00711)





People v Carter


2018 NY Slip Op 00711


Decided on February 2, 2018


Appellate Division, Fourth Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on February 2, 2018
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Fourth Judicial Department

PRESENT: CARNI, J.P., LINDLEY, NEMOYER, CURRAN, AND TROUTMAN, JJ.


1063 KA 13-00303

[*1]THE PEOPLE OF THE STATE OF NEW YORK, RESPONDENT,
v
PRESTON CARTER, DEFENDANT-APPELLANT. 






MARK D. FUNK, CONFLICT DEFENDER, ROCHESTER (KATHLEEN P. REARDON OF COUNSEL), FOR DEFENDANT-APPELLANT. 
SANDRA DOORLEY, DISTRICT ATTORNEY, ROCHESTER (DANIEL GROSS OF COUNSEL), FOR RESPONDENT. 


 Appeal from a judgment of the Monroe County Court (Frank P. Geraci, Jr., J.), rendered November 28, 2012. The judgment convicted defendant, upon a jury verdict, of murder in the second degree. 
It is hereby ORDERED that the judgment so appealed from is reversed on the facts, the indictment is dismissed, and the matter is remitted to Monroe County Court for proceedings pursuant to CPL 470.45.
Memorandum: On appeal from a judgment convicting him after a jury trial of murder in the second degree (Penal Law § 125.25 [1]), defendant contends, inter alia, that the verdict is against the weight of the evidence. We agree. Although the People may have proved that defendant is probably guilty, the burden of proof in a criminal action is, of course, much higher than probable cause; the prosecution is required to prove a defendant's guilt beyond a reasonable doubt, and the evidence in this case does not meet that high standard. For the reasons that follow, we have doubts whether defendant is the person who killed the victim and, in our view, those doubts are reasonable. We therefore reverse the judgment of conviction and dismiss the indictment.
The victim was a middle-aged Caucasian man who lived in the Town of Brighton and frequently engaged in what his friends described as "high-risk" behavior, i.e., "hooking up" with men he met online and engaging in consensual sexual acts with them. According to the victim's closest friend, a woman named Michele, the victim was "addicted" to sex, sometimes meeting up with more than one partner on the same day. Michele testified that the victim preferred his sexual partners to be "young black males who looked thuggy or street-like, kind of a danger and edge to them—that was his type." There was also testimony that the victim would "cruise" certain parts of the City of Rochester looking for black men with whom to meet.
On November 16, 2008, the victim checked into a hotel in Henrietta at 6:59 p.m. According to Michele, the victim liked to use this hotel for sexual trysts because its security was "lax." An African-American man entered the hotel with the victim, but did not approach the front desk with him. Instead, the man walked toward the elevator. The hotel employee working at the front desk recognized the victim from prior visits and, during the check-in process, the victim said that there would be two guests in the room. The employee gave the victim two keys to Room 333, located on the third floor. The victim took the keys and walked to the elevator.
The employee who dealt with the victim left work at 11:00 p.m. and did not see him or the other man leave the hotel, and neither did the front desk employee who replaced her and worked the overnight shift. Aside from the front entrance, there were four other ways to enter and exit the hotel, and one could come and go through those doors without passing by the front desk. There was a surveillance camera that covered the registration desk, but there were no other [*2]cameras at the hotel or in the parking lot.
At 9:19 that night, the victim called his teenage son from his cell phone and said that he did not know where he was. According to the son, the victim sounded "very confused" and was "panicking" before hanging up abruptly. The son called the victim back several times, but the victim initially did not answer. At 9:21 the victim finally answered a call from his son and said that everything was fine and that he had just been joking. The victim hung up before the son could seek clarification.
At approximately 10:00 the following morning, a hotel employee entered the victim's room and observed blood on the walls and floor. The police were called to the scene, and the victim's dead body was found on the floor next to the bed under a blanket. His skull had been crushed in several places by what the Medical Examiner believed to have been a blunt instrument of some sort. The victim also had bruises all over his body and multiple cuts on his face. There was tape that had been wrapped around the victim's left hand, suggesting that someone had tried to restrain him, and ligature marks around his neck, as if he had been strangled. No murder weapon was recovered, although the police found the hand grip of a pellet gun on the floor in the hotel room. The grip had apparently broken off the handle of the gun.
A murder investigation commenced, resulting approximately three years later in defendant's arrest. At the time of his arrest, defendant was 28 years old and had no criminal record.
The evidence at trial established beyond a reasonable doubt that defendant was the person who entered the hotel with the victim at 6:59 p.m., and that defendant lied to the police by repeatedly denying that he knew the victim or had contact with him. The police found in the hotel room a receipt from a convenience store that was given to someone who purchased an item with an Electronic Benefit Transfer Card issued to defendant by the New York State Office of Temporary and Disability Assistance. The receipt was on the floor next to the victim's body.
In addition, phone records established that the victim had made several calls to the landline telephone at defendant's residence on November 16, 2008. Shortly after the last call, the victim used his home computer to reserve the hotel room. After discovering the victim's body in the hotel room, the police searched for his vehicle, which was not in the hotel parking lot. The vehicle was found later that day parked on a city street approximately six-tenths of a mile from defendant's residence. Inside the vehicle, the police found printed Mapquest directions to a residence located at 23 Roxborough Road. No such address exists, but defendant resided at 203 Roxborough Road, and the directions were printed moments after the victim reserved the hotel room.
Finally, a hair found on the sink in the bathroom of the hotel room was linked to defendant. Mitochondrial DNA testing showed that the DNA of the hair matched defendant's DNA, and that, unlike defendant, 99.91% of the population could be excluded as a source. It is thus clear that the victim picked up defendant at his residence and drove him to the hotel, and that the two entered the room together.
Nevertheless, under the circumstances of this case, the mere fact that defendant was in the hotel room with the victim, and most likely engaged in sexual acts with him, does not establish beyond a reasonable doubt that defendant is the person who killed him. As the People acknowledge, the Medical Examiner did not determine the time of death. Thus, as far as we know, the victim could have been killed at any time between 9:21 p.m. on November 16, 2008, when he spoke to his son on the phone, and 10:00 the next morning, when his body was found. Moreover, the evidence at trial suggests that someone other than defendant may have been in the hotel room with the victim that night, and that the victim may have left the hotel room at some time after he checked in with defendant.
With respect to whether there were other people in the hotel room with the victim other than defendant, we note that DNA from two males was obtained from a plastic drinking cup in the hotel room, and testing excluded defendant as a contributor. Defendant was also excluded as the source of a second strand of hair found on the bathroom sink, and the victim was excluded as well. A blond strand of hair was found on the victim's abdomen and, although DNA testing [*3]could not be done on the hair, the victim did not have blond hair and the People's expert testified that she would not expect the hair to have come from an African-American. A blond strand of hair was also found in the victim's vehicle after it was recovered by the police, and a pair of women's underwear was found in the bathroom of the hotel room.
There is also evidence that the victim may have left the hotel before he was murdered. To begin with, the phone call the victim made to his son at 9:19 p.m.—the one during which the victim sounded confused and said that he did not know where he was—was processed through an AT & T cell tower located at 350 Buell Road in the Town of Gates. The same is true of the call received by the victim from his son two minutes later. The hotel is in the Town of Henrietta, which is not contiguous to the Town of Gates. The AT & T representative who testified at trial did not know which of its cell towers serviced calls made and received at the hotel. It thus cannot be said with any degree of certainty that the victim was at the hotel when he spoke with his son.
The victim's phone was also used at 10:21 p.m. to call a number in the 315 area code; the call was not connected, meaning that the other person did not answer. No evidence was offered at trial as to whom that call was made. The People suggested at trial that defendant made that call on the victim's phone after committing the murder, but we are not so sure. The record does not reveal whether the police tracked down the intended recipient of the call to determine if he or she knew defendant or the victim.
The evidence further showed that someone used the computer in the victim's bedroom at his home at 10:49 that same night. The victim's bedroom was on the first floor of a condominium he shared with his son and an adult female friend, both of whom had computers in their rooms and testified that they did not use the victim's computer that night.
It is also curious that a key to the hotel room was found in the center console of the victim's vehicle. The People's theory is that defendant, after committing the murder, drove the victim's car to within a mile of his home and then left it on the side of the street. But why would defendant take a hotel key with him after killing the victim? One did not need a key to exit the hotel. And why would defendant place the key in the center console, as if he intended to return to the hotel? It seems more likely that the victim placed the room key in the center console. We note that, although the murderer left bloody footprints on the carpet in the hotel room, and blood was splattered on the walls, ceiling, and floor of the room, no blood was found in the victim's vehicle, not even on the brake or gas pedals.
A review of the victim's emails from the day in question reveal that he engaged in communications with several men other than defendant and discussed with them meeting for sexual activity. It appears undisputed that the victim met up with one such man earlier in the day at a different location. The victim exchanged multiple emails with another man who expressed interest in meeting. The victim informed this man, whose first name was Waki, that he had a hotel room and inquired whether Waki needed a ride. Waki instructed the victim to call him to discuss things further, and provided the victim with a number to call. That was the last email between the two.
The People posit that the victim never called Waki because his cell phone records do not reflect a call to Waki's number. As the defense pointed out at trial, however, the People did not offer into evidence the records from the victim's landline telephone at home or from the telephone in the hotel room. The fact that the victim did not call Waki from his cell phone does not establish, ipso facto, that the two did not meet that night. Although the police located Waki and questioned him about the homicide, they did not obtain a DNA sample from him. We therefore do not know whether Waki is a match for any of the DNA samples obtained from the hotel room and the victim's vehicle.
Nor did the police obtain a DNA sample from a man named Shaft, the victim's ex-boyfriend. According to Michele, the victim's closest friend, Shaft had been abusive and unfaithful to the victim, and that is why the relationship ended. Several witnesses testified at trial that the victim planned to reconnect with Shaft on the weekend of his murder, and two of the victim's coworkers testified that the victim said a day or two before his death that he had plans that weekend to meet a new person and an old boyfriend. When talking to one coworker about [*4]the old boyfriend, the victim "seemed really nervous" and his lips were quivering. The coworker had never seen the victim act like that, and said that perhaps it was not a good idea for him to see the ex-boyfriend. Although obviously nervous, the victim did not change his mind, saying that "everything is dangerous."
Shaft worked at a restaurant in Henrietta, less than a mile from the hotel in which the victim was murdered. When questioned by the police, Shaft said that he was at his mother's house on the night in question, but the police did not check with Shaft's mother to verify his alibi, nor did they obtain a DNA sample from him.
We note that Shaft's sister, the woman who resided with the victim and his son, called the hotel on the morning that the victim's body was found and asked the person at the front desk to check the victim's room to make sure he was okay. She knew that the victim frequently used that hotel to meet people, and she was concerned because he rarely, if ever, stayed overnight at the hotel. The front desk employee testified at trial that Shaft's sister identified herself as the victim's wife and said that she had called the victim's room directly but got no answer, and that she was concerned because the victim had a heart condition. If Shaft's sister did, in fact, call the victim's room directly, the obvious question is how she knew which room to call.
The People assert on appeal that defendant could not be excluded as a contributor to the DNA collected from the victim's fingernail clippings, as if that were evidence of his guilt. The dissent relies on this evidence as well. The People's expert testified, however, that the tests conducted of the DNA from the victim's fingernails were "inconclusive," i.e., defendant could not be included or excluded as a contributor. In other words, the fingernail DNA evidence was neither inculpatory nor exculpatory, and thus was of little, if any, probative value. The trial prosecutor, to his credit, did not even mention the fingernail DNA evidence during his summation. Although DNA tests were conducted on more than 50 items found in the hotel room and in the victim's vehicle, the only item that was linked to defendant was a hair found on the bathroom sink, the same sink on which the police found another hair that did not belong to either defendant or the victim.
The People at trial relied in part on the bloody footprints that were left on the carpet of the hotel room. The footprint impressions looked similar to impressions made by a pair of Nike boots found by the police in the home of defendant's girlfriend, with whom he lived at the time with their infant daughter. The People's expert acknowledged, however, that there were differences in the arch area of the bloody footprints and the impression made by the Nike boots, and that she could not make a "definitive determination" whether the Nike boots had left the bloody footprints. The expert also acknowledged that the FBI conducted forensic tests on the boots looking for traces of blood and found none, and that blood could remain on boots for decades.
The People's case thus rested on three pillars of circumstantial evidence: (1) the fact that defendant entered the hotel with the victim at approximately 7:00 p.m., some 15 hours before his dead body was found in the hotel room; (2) the fact that defendant repeatedly lied to the police when he said that he did not know the victim and had never met him; and (3) the fact that the victim's vehicle was found abandoned on a city street approximately six-tenths of a mile from defendant's residence.
As noted above, defendant's presence in the room, although incriminating, is by no means conclusive considering that other people may have been in the room with the victim and that the Medical Examiner could not determine the time of death. As for defendant's lies to the police, it appears that he may not have been living as an openly gay man—he had a girlfriend and children from different women— and he may have said that he did not know the victim so as not to reveal his sexual orientation. Finally, although the presence of the vehicle so close to defendant's residence is suspicious, the victim was known to drive around the city looking for sexual partners, and the record does not disclose where Shaft or Waki resided.
The People did not suggest at trial a motive for the brutal killing, which evidently was committed with great malice, and we cannot conceive of a possible motive from our review of the record. "Although motive is not an element of the crime, it nonetheless cannot be ignored" (People v Richardson, 55 AD3d 934, 937 [3d Dept 2008], lv dismissed 11 NY3d 857 [2008]). [*5]Indeed, where, as here, the People's case is based entirely on circumstantial evidence, " motive often becomes not only material but controlling' " (People v Moore, 42 NY2d 421, 428 [1977], cert denied 434 US 987 [1977], quoting People v Fitzgerald, 156 NY 253, 258 [1898]; see People v Mixon, 203 AD2d 909, 910 [4th Dept 1994], lv denied 84 NY2d 830 [1994], reconsideration denied 84 NY2d 909 [1994]).
Concerned "about the incidence of wrongful convictions and the prevalence with which they have been discovered in recent years," the Court of Appeals has stressed the importance of the role of the Appellate Division in serving, "in effect, as a second jury," to "affirmatively review the record; independently assess all of the proof; substitute its own credibility determinations for those made by the jury in an appropriate case; determine whether the verdict was factually correct; and acquit a defendant if the court is not convinced that the jury was justified in finding that guilt was proven beyond a reasonable doubt" (People v Delamota, 18 NY3d 107, 116-117 [2011] [emphasis added]; see People v Oberlander, 94 AD3d 1459, 1459 [4th Dept 2012]).
We agree with the dissent that an appellate court must give great deference to a jury's credibility determinations inasmuch as the jury is in a far superior position to assess the veracity of witnesses (see People v Bleakley, 69 NY2d 490, 495 [1987]). Here, however, the jury was not called upon to make credibility determinations, as almost all of the relevant facts adduced at trial were undisputed. Instead, the jury was asked to make inferences based on the evidence, a task that we are no less qualified to undertake.
Quoting People v Cahill (2 NY3d 14, 58 [2003]), the dissent also asserts that our authority to review the weight of the evidence in a criminal case is not an " open invitation' " to substitute our judgment for that of the jury. "Of course that is true," the Cahill Court went on to say in a portion of the decision not quoted by the dissent. "But on the other hand, weight of the evidence review does not connote an invitation to abdicate our responsibility" to independently weigh the evidence (id.) and "to serve, in effect, as a second jury" (Delamota, 18 NY3d at 117). The mere fact that the jury rendered a guilty verdict is only the beginning of our analysis.
In sum, based on our independent review of the evidence, and viewing the evidence in light of the elements of the crime as charged to the jury (see People v Danielson, 9 NY3d 342, 349 [2007]), we conclude that the verdict is against the weight of the evidence and cannot stand (see generally Bleakley, 69 NY2d at 495). Although the police cannot be faulted for arresting defendant, nor the People for prosecuting him, the evidence at trial simply failed to prove defendant's guilt beyond a reasonable doubt. There are too many unanswered questions for us to be comfortable that the right person is serving a life sentence for the victim's murder.
All concur except Carni, J.P., and Curran, J., who dissent and vote to affirm in the following memorandum: We agree with the implicit determination of our colleagues that there is sufficient evidence to support the jury's verdict of murder in the second degree (Penal Law
§ 125.25 [1]), but we respectfully disagree with their conclusion that the verdict is against the weight of the evidence. We therefore would affirm the judgment of conviction.
The standard for weight of evidence review is well settled and set out by the Court of Appeals in People v Bleakley (69 NY2d 490, 495 [1987]): "If based on all the credible evidence a different finding would not have been unreasonable, then the appellate court must, like the trier of fact below, weigh the relative probative force of conflicting testimony and the relative strength of conflicting inferences that may be drawn from the testimony' . . . If it appears that the trier of fact has failed to give the evidence the weight it should be accorded, then the appellate court may set aside the verdict."
This, of course, is not an "open invitation" for an appellate court to substitute its judgment for that of the jury (People v Cahill, 2 NY3d 14, 58 [2003] [internal quotation marks omitted]). Rather, an appellate court must give "[g]reat deference" to the jury's resolution of factual issues (Bleakley, 69 NY2d at 495). It is the "fact-finder[]" that has the "opportunity to view the witnesses, hear the testimony and observe demeanor" (id.), and the Court of Appeals has emphasized that "those who see and hear the witnesses can assess their credibility and reliability in a manner that is far superior to that of reviewing judges who must rely on the printed record" (People v Lane, 7 NY3d 888, 890 [2006]).
Bearing those principles in mind, we conclude that the jury was justified in finding defendant guilty of murder in the second degree beyond a reasonable doubt. The majority recognizes that the People presented overwhelming evidence that defendant was in the hotel room the night before the victim's body was discovered. While that evidence does not necessarily establish that defendant killed the victim, there is ample circumstantial evidence supporting that conclusion reached by the jury. Specifically, the evidence established that the victim's car was seen outside the Chili Mini Mart at 6:30 p.m. The victim checked into the hotel at 6:59 p.m. with a black male, whom, as the majority concedes, the evidence established beyond a reasonable doubt was defendant. While the victim spoke with his son by telephone a couple of times at approximately 9:20 p.m., no one was able to contact the victim after those telephone calls. A receipt from the Chili Mini Mart with defendant's welfare benefit number was found on the floor near the victim's feet, and it had the victim's blood on it. The victim's car was found the following day only six-tenths of a mile from defendant's residence, with a keycard for the hotel where the victim was found in the car's center console. Using a known sample of defendant's DNA as a basis for comparison, defendant could not be excluded as the source of DNA from various pieces of evidence, including fingernail scrapings on the victim's right hand, a crease of tape used to bind the victim's hands, and a swab taken from the steering wheel of the victim's car. Further, the right boot from a pair of defendant's boots looked similar in shape and pattern to the bloody footprints found at the scene.
The majority goes to great pains to identify some evidence that possibly suggests that someone other than defendant may have been in the hotel room with the victim that night, and that the victim may have left the hotel room at some time after he checked in with defendant. In our view, however, that amounts to no more than impermissible speculation and, notably, there was no real evidence of any meeting between the victim and anyone else that night. In light of the above evidence establishing defendant's guilt, we cannot conclude that the verdict is against the weight of the evidence (see generally Bleakley, 69 NY2d at 495).
Entered: February 2, 2018
Mark W. Bennett
Clerk of the Court